GALICICH v. OREGON SHORT LINE R. CO. ET AL.

(No. 2080; February 14, 1939; 87 Pac. (2d) 27)

For the plaintiff and appellant, there was a brief by *Joseph H. Galicich* of Rock Springs, Wyoming, and *Anderson, Bowen & Anderson* of Pocatello, Idaho, and oral argument by *Mr. Walter H. Anderson.*

For the defendants and respondents there was a brief by *John U. Loomis* of Cheyenne and *T. S. Taliaferro, Jr.,* and *Arthur L. Taliaferro* of Rock Springs, and oral arguments by *Mr. Loomis* and *Mr. Taliaferro, Jr.*

130

132

RINER, Chief Justice.

The question to be resolved in this case is whether the district court of Sweetwater County committed reversible error in directing a verdict in favor of the defendants and respondents, Oregon Short Line Railroad Company, a corporation, and Union Pacific Railroad Company, a corporation, hereinafter usually referred to as the "Companies" or as the "defendants," and against the plaintiff, Joseph H. Galicich, administrator of the estate of Walter M. Middleton, deceased, subsequently herein mentioned as the "plaintiff" or the "administrator." The action was one charging the companies with negligence in causing the death of plaintiff's intestate, Walter M. Middleton. The material facts to be considered are not so very complicated, and are substantially these, as developed by the testimony of the witnesses for the plaintiff:

On the evening of November 11, 1935, one E. G. Edwards and the said Walter M. Middleton were employed as conductor and brakeman respectively on a freight train owned and operated by the defendants aforesaid between Green River, Wyoming, and Montpelier, Idaho. This train was westbound and had reached Granger, Wyoming, where it became necessary to do some switching, involving in the course of it the setting out of twenty-one refrigerator cars and the picking up of twenty-one tank cars. The accident in question occurred during these switching operations at the highway crossing presently to be mentioned, about 6:30 P. M., when it was dark, but when there was no rain, snow, fog, wind or other abnormal atmospheric conditions tending to obscure the visibility of objects. An oiled surface highway crosses the right-of-way of the defendants about one-half mile west of the railroad

station located at Granger. At that crossing point there were three railroad tracks which extended in an easterly and westerly direction and the highway crossed them in a northerly and southerly direction, running for about one-half mile from the crossing straight north. These tracks are designated in the record: Track 2 on the north, track 1 next to it on the south, and the main track of the defendants next to that on the south. Track 2 joined track 1 about eight hundred feet west of the crossing, the latter joining the main track about one hundred feet west of the junction of those two tracks.

The surface of the highway was dry and its oiled portion at the crossing approximately twenty feet wide. There is a railroad wigwag signal located six or eight feet north from the number 2 track on the west side of the highway, which is described as a round disc, with a red light in the center, located on an arm about eighteen inches or two feet long, the disc swinging back and forth at the end of the arm when operating and a bell ringing during the same time that the arm is swinging. While a train is on the number 1 or 2 tracks the wigwag does not work, but when it reaches a point, called the fouling point, against the main track, where the train goes out from the main track, then it opens an electrical circuit, and the wigwag starts operating. During the switching operations above referred to and when the accident happened, there were cars in the train located in such a position on the tracks that they would thus cause the wigwag signal to work. The freight train conductor, Edwards, as a witness called for the plaintiff, testifies that he saw the wigwag signal operating both at the time his train backed upon the crossing and also shortly after the accident happened. The train aforesaid, in the course of these switching operations mentioned above, moved backward and eastward, with the engine heading west on the west end of

a string of one hundred one cars, about seventy or seventy-five of which were on the main track, the rest of them being on the number 2 track, with three or four cars east of the highway crossing at the time the accident occurred, all of them in motion at a speed of about six miles per hour.

Prior to this backing movement of the train, Edwards had directed Middleton, who was its rear end brakeman, to get off the cars and flag highway traffic at the crossing as the train moved eastward. Edwards himself rode the easterly car and got off at the highway crossing, taking a position about the middle of the oiled surface part of the highway and about fifteen feet north of the train in a sidewise position, facing the west so that he could see both the train and the road to the north. While thus located he was engaged in counting the twenty-one cars to be cut out of the train, and he then noticed an automobile approaching from the north, giving it his entire attention as it drew closer to the crossing. Middleton was standing in the center of the highway between Edwards and the train, about six feet north of and facing the train. He had been advised by Edwards that twenty-one cars were to be taken off, and it would have been Middleton's duty to make the cut when Edwards told him to do so. Edwards had not told Middleton that he, Edwards, would flag the crossing himself when he got there.

Edwards first noticed the auto coming from the north when it was about one thousand feet distant from him; when he looked again in its direction it was about five hundred feet away. Edwards then turned, facing north, as he testified, and gave stop signals to the driver of the car by waving his lighted electric lantern crosswise of the road in front of him. He continued to give these signals until the automobile had reached a point, as he says, about one hundred fifty feet from him, reaching the conclusion at that time that the auto-

mobile would not stop despite the signals given. He immediately called to Middleton to look out and himself endeavored to get off the highway by running almost directly east. However, the automobile swerved in that direction, and its left side, as he thought, struck him as he reached the eastern edge of the oiled surface of the highway, rendering him unconscious for a short period and inflicting injuries upon both his legs and several other bruises on his body and head. After striking Edwards the auto continued on, striking and killing Middleton, coming to rest east of the highway, facing east, and apparently completely off the highway. Middleton's body lay between the front wheels of the auto and the train. When Edwards regained consciousness he signaled the train to stop.

Edwards was unable to estimate the speed of the automobile though it appeared to be moving at a fairly good rate of speed, as he said. There was nothing in the manner in which it approached Edwards, until it reached a point one hundred fifty feet distant from him, which indicated that it would not stop. Freight cars could be seen under the visibility conditions prevailing at the time possibly four hundred feet. Lantern signals could be seen approximately one hundred one car lengths or something over four thousand feet, a freight car being about forty feet long. Edwards was struck very shortly after he called to Middleton, a little longer than half a second afterwards. His being struck and his warning to Middleton were all, as he testified, "close together."

The driver of the auto, one Bertagnolli, was an experienced automobile driver, familiar with this highway crossing, having traveled on that portion of the highway for some twenty-eight years. He was driving a truck with a light load, its lights and brakes being in good condition. In the course of his testimony, as a witness for the plaintiff, he stated that when he arrived

at the highway crossing he was probably going at the rate of eighteen or twenty miles an hour; that he did not see anything until he got close to the railroad track, probably twenty or thirty feet from it, when he could see a yellow car moving and then realized that a train was moving there; that he threw on the emergency brakes and turned to the left endeavoring to clear the train, but the car grazed a post on the right side of the truck and pushed him over against a stock corral, which was located north and east of the highway and near the railroad tracks aforesaid; that he was looking out to see as he was coming along, but at no time saw any men on the highway, with or without lanterns, giving signals; that he did not hear any bells or warning signals of any kind as he approached the crossing. To the question, "Were you injured in the accident?" he replied, "Not, only kind of in a stupor, a little stupor, for a few seconds, and then I come right out." He also testified that a young man asked him immediately after the accident and while he was in the truck if he were hurt, and he said "no," and that he, Bertagnolli, just stepped out of the truck, and its engine was still running and its lights were still on.

Plaintiff alleges in his second amended petition that Bertagnolli was driving at a speed not less than fifty miles an hour. It was admitted by the pleadings of both plaintiff and defendants that Bertagnolli approached the tracks from the north in said truck "at a high, dangerous, rapid and negligent rate of speed," and also that he did this "without keeping a proper or any lookout for persons and objects along and upon said highway, and particularly as to said Walter M. Middleton, Deceased, and without having said automobile under such control that the same could be stopped within the range of the lights thereon."

When the plaintiff had concluded his case, embodying the testimony and facts above detailed, defendants

moved for a directed verdict, which motion was sustained, and judgment was rendered accordingly. The contention of appellant is, of course, that the district court erred in its action in this respect. It is urged that the defendants did not furnish Middleton with a safe place in which to do his work and that they should have warned Middleton of the dangerous situation produced by the failure of Bertagnolli to stop his automobile in time to avoid striking and killing Middleton.

This court has heretofore indicated that in determining whether the trial court properly sustained a motion for a directed verdict the evidence of the plaintiff must be accepted as true, with the reasonable inferences to be drawn from it, and that where this fails in law to establish a claim, it is the duty of the court of first instance to so instruct the jury. Rosson v. Hylton, 45 Wyo. 540, 548, 22 P. (2d) 195, and cases cited therein.

It is stated in 39 C. J. Section 418, Page 291, upon the authority of an extended list of cases from over twenty jurisdictions in this country, that, "A master is not as a rule liable for injuries to his servant caused by the acts or omissions of third persons over whom he has no control." Another legal principle which we apprehend is pertinent here is stated in the same text, 39 C. J. 506-507, Section 615, thus:

"A master is under no obligation to warn his servant of a special danger which springs out of a particular fact, which in its details cannot be anticipated, nor generally of any dangers that cannot be reasonably apprehended; in other words, the master is not required to caution a servant against unexpected, improbable, and unusual occurrences, where there is no appearance of danger, his duty to warn being limited to such perils as may reasonably be anticipated."

18 Ruling Case Law 571, Section 78, puts the statement somewhat more briefly in this form:

"The employer is not bound to foresee and give warn-

ing of remote, improbable, and exceptional occurrences; his duty is limited to such perils as reasonably are to be anticipated."

Where the evidence tended to show that plaintiff was struck by a brick swept from the roof of a roundhouse by an employee of an independent contractor, the roundhouse being at the time in the process of enlargement and the work being performed by the contractor aforesaid, in Pierson v. Chicago, R. I. & P. Ry. Co., 170 Fed. (C. C. A. 8th Cir.) 271, in affirming a directed verdict for the defendant the court said:

"Here the place furnished the plaintiff for the performance of his work was in itself no way dangerous, and the defendant had no occasion to anticipate that the servants of the contractor, over whom it had no control whatever, would sweep bricks from the roof and thereby cause injury to the plaintiff."

There was also quoted with approval by the court the statement in Taylor v. Washington Mill Co., 50 Wash. 306, 97 Pac. 243:

"It is not the duty of an employer to follow his employes around in order to protect them from situations made dangerous by unusual occurrences unexpected, and not to be anticipated by either the master or the servant."

In Aqua System, Inc., v. Kodakoski, 88 Fed. (2d) (C. C. A. 5th Cir.) 395, citing many authorities, the general principle was announced:

"It is not the duty of an employer to warn his employee of a danger of which the employer does not know and could not have discovered in the exercise of reasonable care."

See also Madison v. Phillips Petroleum Co., 88 Fed. (2d) (C. C. A. 5th Cir.) 515.

In Sommers v. Standard Mining Co., 146 Mich. 111, 109 N. W. 30, it appeared that plaintiff was injured by

being struck by a loaded car of coal in a mine. This car had come out of a gallery and down to the shaft by force of gravity, having been permitted so to do by the act of an intermeddler or miner in the gallery. No cars had ever so come out before. Affirming a directed verdict for the defendant, the court said:

"Was it to be reasonably apprehended that cars other than those moved by the driver would come out of this gallery? None had ever so come out. The regular course of defendant's business involved no such thing. Rather it insured against it. It is not apparent how any set of rules upon the subject would operate more effectively than did the division of labor proven, the assignment of the duty of moving cars to the driver alone. Moran v. Rockland T. & C. St. R., 99 Me. 127, 58 Atl. 676; Rutledge v. Mo. Pac. R. Co., 123 Mo. 121, 24 S. W. 1053, 27 S. W. 327. See, also, Deye v. L. & S. Mach. Tool Co., 70 C. C. A. 64-66, 137 Fed. 480. Nor can it be said that failure to inform plaintiff of a not to be apprehended danger was the cause of his injury. The verdict was properly directed."

Where plaintiff's intestate was killed as a result of a truck driver's act in hitting and displacing a railroad switch, causing a train derailment, the Texas Commission of Appeals, in directing a reversal of the judgments of the inferior courts and that judgment be entered for the railroad companies as defendants, in Paris & N. Ry. Co. v. Stafford, 53 S. W. (2d) 1019, said:

"In order for defendants in error to recover in this cause, the rule that established negligence does not give rise to a cause of action under the Federal Employers' Liability Act (a) if there was a direct, independent, and efficient intervening cause, or (b) if the consequences should not reasonably have been foreseen or anticipated, must be overruled. The law does not impose the rule upon the railroad companies that they could foresee or reasonably anticipate, and that they were required to anticipate or to provide for trespasses upon their property by persons in no way connected

with the service or employment of the companies. On the contrary, the law imposes the presumption that the negroes involved in this controversy and all other persons would refrain from committing trespasses upon the right of way of the railroads. The railroad companies had the right to indulge in this presumption and to calculate the natural and probable result of its acts and omissions upon this supposition. The companies could not assume anything else, for it would be impossible, impracticable, and inequitable to predicate and administer the rights and remedies of persons upon the theory that those persons entirely disconnected with the companies would either violate the laws or disregard their duties by trespassing upon the rights and property of others. Such a rule finds no place in the administration of justice."

In Madden v. J. F. Mulligan Co., 193 N. C. 438, 137 S. E. 311, the facts were that plaintiff in performing his duties as an employee of the defendant, a road construction company, picked up a bag of cement lying on the side of the road which the defendant was constructing, and started across the road to the concrete mixing machine, which was located on the opposite side of this highway. He was struck by a passing automobile, knocked down, and badly hurt. The defendant had located this concrete mixing device on one side of the road and had piled sand and cement, which was to be used in it for the road construction, on the opposite side. The space between the mixing machine and the sand and cement was about twelve feet and was kept open for travel. Affirming a judgment dismissing the action, the court said:

"Plaintiff alleges that defendant, his employer, was negligent in that it failed to exercise due care to furnish him a reasonably safe place to work, or to warn him of the approach of the automobile, which struck and injured him, and that this negligence was the proximate cause of his injuries. The court was of opinion that, upon all the evidence, plaintiff could not

recover of defendant, and therefore, upon defendant's motion, rendered judgment dismissing the action as upon nonsuit. In this we find no error."

The State of Wisconsin had a "safe place" statute, which required a place of employment to be safe and the employer to adopt and use such methods as are reasonably adequate to render the employment and place of employment safe. Invoking this law a pleading was filed which alleged among other facts that the plaintiff was injured while in the employ of the Janesville Traction Co., and that at the time of the accident he, a motorman of one of said company's street cars, had brought it to the terminal of its run at the city limits; that there a brick paved highway was located, with curbs on either side; that at that time an auto was parked on the east side of the street near the curb, where such vehicles are usually parked, and that the space between the street car and the automobile thus placed was narrow, leaving no reasonably safe space for a person to be in when automobiles were passing between the street car and a parked automobile. The pleading also stated that the plaintiff disengaged the trolley at one end of the car, then walked to the other end and engaged the trolley there; that he was returning to the street car door, whence he had come, when an automobile driven by one Tormey came into the aisle between the street car and the parked auto, at a high rate of speed, putting the plaintiff in danger. In attempting to escape the danger threatening him, he jumped across the aisle to a position behind an auto parked at the east curb. At that instant one Tegt, driving an auto immediately behind Tormey's car and likewise at excessive speed, swerved his machine to the east and crushed the plaintiff against the parked car and injured him seriously. The automobile drivers and the Traction Company were all made defendants in the action to recover damages for these injuries.

Holding that no cause of action had been stated against the Traction Company and reversing an order overruling its demurrer to the plaintiff's pleading aforesaid, in Baker v. Janesville Traction Co. et al., 204 Wis. 252, 234 N. W. 912, the court concluded its opinion in the case with this language:

"Plaintiff's injuries in this case were not caused by any failure of the defendant to perform its duty under the statute, but were immediately and proximately caused by the unlawful acts of the other defendants, according to the allegations of the complaint. The statute does not require an employer to protect his employee against willful, unlawful, or even negligent acts of others. Wood v. Railway Signal Co., 161 Wis. 71, 151 N. W. 269. It relates to the premises and the conduct of the business of the employer and to the control of those methods and processes which are used in the employer's business over which he has a right of control and does not make the employer liable for the unlawful acts of third persons over whom he has no control or right of control."

In an action against a railroad for allegedly negligently causing the death of a crossing flagman, one Dretzka, when an automobile, driven by one Dubovich, was struck by a train as it passed over the crossing and the auto thrown against the flagman, the negligence charged was in failing to keep a proper lookout on the part of the train crew and in failing to make timely application of the brakes on the train. Reversing a judgment for plaintiff and directing a dismissal of the action, the Supreme Court of Wisconsin in Dretzka v. Chicago & N. W. Ry. Co., 216 Wis. 111, 256 N. W. 703, said:

"The testimony seems to be without dispute that Dubovich stopped at least twice on the westerly side of the track outside of the zone of danger and at a point where the on-coming train was clearly within his view. The witness who testified there were three stops said that there were only four or five seconds between

the second and third stops. It seems quite clear that Dubovich did not have control of his car. The last movement of his car before he was struck must have taken place when the train was only a short distance away. The train was traveling at a speed variously estimated from $10\frac{1}{2}$ to 20 miles an hour. The car had nearly passed to the east out of the zone of danger when struck. It does not appear, therefore, that, however vigilant a lookout the engineer and fireman might have maintained, they could have discovered that Dubovich was in actual peril more than four or five seconds before the collision and at a time when it could not have been avoided. The proximate cause of Dretzka's injuries was the negligence of Dubovich in driving his car upon the track in the face of the on-coming train. Some contention is made that the trainmen should have observed that Dubovich was having trouble with his gear shift. An engineman cannot be guilty of negligence in failing to discover that the driver of a car in a place of safety is having trouble with his gear shift. The defendant, having committed no act of negligence, that is, having failed to perform no duty it owed to Dubovich, cannot be held liable for the consequences of the collision.

"Upon the argument, it was conceded that the driver of the automobile was guilty of negligence. If he was, such negligence consisted of his going upon the track in the face of an approaching train, a thing which the employees of the defendant company had a right to assume he would not do. It is not to be expected that railway trains can be stopped every time a person appears at a place where he may thereafter by his own act place himself in a place of imminent danger. As the trial court instructed the jury, the employees of the defendant have a right to assume just the contrary. There is no evidence in this case that the conduct of the engineer and fireman were in any degree reckless or that the automobile was at a place which put Dretzka in a place of imminent danger at a point of time when the train by any possibility could have stopped. For the reasons stated, the defendant is not liable because its employees were not guilty of negligence which contributed to the death of plaintiff's intestate."

See, also, Tobler v. Pioneer Mining & Mfg. Co., 166

Ala. 482, 52 So. 86; Holmes v. Davis, Director General, et al., 126 S. C. 231, 119 S. E. 249; Ward v. Southern Ry. Co., 206 N. C. 530, 174 S. E. 443; Reilly v. Parker, 31 N. Y. S. 1014; Wilson v. Northern Pacific Ry. Co., 31 Wash. 67, 71 Pac. 713.

We think these authorities make it clear that the defendants in the case at bar were not at fault under the circumstances shown by the evidence herein. The injuries to plaintiff's intestate were in our judgment caused solely by the acts of the driver of the car, over whom the defendants exercised no control whatsoever. As in the situation disclosed in the last case reviewed above, in the case at bar Edwards, the conductor, did not discover that both he and Middleton were in actual peril more than a few seconds before they both were struck down by Bertagnolli's truck, driven, as plaintiff and the defendants both concede, at a high and negligent rate of speed. While Edwards as a matter of humanity endeavored to warn Middleton of the impending danger, he was not as a matter of law required to do so. Section 314 Restatement of the Law of Torts and authorities hereinabove cited. As we view the matter, Edwards and the other train employees had a right to assume that Bertagnolli would in ample time bring his truck to a stop and not run into them or the moving train. That he did not do so was not the fault of the defendants, nor of Edwards. Neither the defendants nor Edwards were bound to foresee and warn Middleton of the improbable and unforeseeable danger of Bertagnolli running into a moving train in plain view of the latter. It is undisputed that the lights and brakes on Bertagnolli's car were in perfect order, that these lights were in satisfactory operation, that lantern signals could be seen some four thousand feet and a freight car four hundred feet even when there were no lights at all. It is true that Bertagnolli testifies he saw no signals, no men, lanterns or wigwag working

at the highway crossing and no cars until he got within twenty or thirty feet of the moving train. Yet the actual physical fact remains that they were all there at the crossing at the time the accident happened and if he had looked he must have seen them. The headlights of his car shone full upon them as he approached the crossing, for, as we have seen, the road was straight for at least one-half mile before it came upon the crossing. It may be noted in this connection that Bertagnolli states in his testimony that he was not hurt in the accident, but that he was in a little stupor. What caused that stupor or how long it prevailed before the accident the record does not disclose.

This court in Chapman v. Ewing, 46 Wyo. 130, 24 P. (2d) 687, has heretofore referred to the legal principle stated in Autio v. Miller, 92 Mont. 150, 11 P. (2d) 1039, that:

" 'Moreover, a person is presumed to see that which he could see by looking. * * * He will not be permitted to say that he did not see what he must have seen, had he looked,' as Mr. Justice Toole said in Grant v. Chicago, M. & St. Paul Ry. Co., 78 Mont. 97, 252 P. 382, 386. 'The duty to keep a lookout includes the duty to see that which is in plain sight.' Pollard v. Oregon Short Line R. Co., 92 Mont. 119, 11 P. (2d) 271."

See also O'Malley v. Eagan, et al., 43 Wyo. 233, 2 P. (2d) 1063.

In Monk v. Wabash Railroad Co., 166 Mo. App. 692, 150 S. W. 1087, this same principle is bluntly stated thus:

"The patent and indisputable fact that plaintiff was on the track and was run upon by the train, not only neutralizes the evidence, but it establishes affirmatively that they saw him or else were not looking. (Ellis v. Met. St. Ry. Co., 234 Mo. 657, 673; Lynch v. Ry. Co., 208 Mo. 1, 24.) It has been several times ruled by the supreme and appellate courts that testimony of a witness, with normal eyesight, who is looking in the direc-

tion of an object in plain view, that he did not see such object, should not be accepted as the truth."

It is insisted that Bertagnolli's testimony just mentioned produced a case of conflicting evidence upon which the plaintiff was entitled to go to the jury. We do not think so. As said by the Court of Appeals of Tennessee in De Kalb County v. Tennessee Electric Power Co., 17 Tenn. App. 343, 67 S. W. (2d) 555, quoting from and affirming its previous rulings:

" 'It is the duty of the court to direct a verdict unless the conflict is positive. The conflict must be real, not merely apparent. A mere dogmatic assertion, which does not appeal to the reason of the court, which does not have substance and relevant consequence, which does not have fitness to induce conviction, is not proof, even if uncontradicted, and does not interfere with the duty of the court to direct a verdict.'

"It is true that even where the facts are undisputed, if intelligent minds may draw different conclusions as to the matter at issue, questions of negligence are ordinarily for the jury. Carey Roofing & Manufacturturing Co. v. Black, 129 Tenn. 30, 164 S. W. 1183, 51 L. R. A. (N. S.) 340. But this rule does not overcome the effect of the rule that a verdict cannot be based upon mere guess or conjecture if intelligent minds may not draw therefrom different conclusions upon the question of negligence."

See, also, Montgomery Ward & Co. v. Arbogast (Wyo.) 81 P. (2d) 885, and cases there cited.

We conclude, therefore, that the district court was correct in directing a verdict for the defendants and in entering its judgment accordingly. The judgment should be affirmed.

*Affirmed.*

KIMBALL and BLUME, JJ., concur.