BEULAH HAWKINS, Administratrix of the Estate of J. G. Hawkins, Deceased,

*Plaintiff and Respondent,*

vs.

LOFFLAND BROTHERS COMPANY,

*Defendant and Appellant.*

No. 2542; November 18, 1952; 250 Pac. (2d) 498)

For the defendant and appellant the cause was submitted upon the brief of Edward E. Murane and R. R. Bostwick, both of Casper, Wyoming, and oral argument by Mr. Murane.

For the plaintiff and respondent the cause was submitted upon the brief and also oral argument of William H. Brown, Jr., of Casper, Wyoming.

## OPINION

RINER, Justice.

Beulah Hawkins, administratrix of the estate of J. G. Hawkins, deceased, as plaintiff filed an action in the district court of Natrona County against Loffland Brothers Company, a corporation, as defendant. The case arose in consequence of a collision between an automobile driven by Hawkins and a truck-tractor and semi-trailer owned by the defendant. Plaintiff obtained a jury's verdict against said defendant upon which the court entered a judgment in her favor. It is from that judgment this appeal is prosecuted. The plaintiff will be hereinafter usually referred to as respondent and defendant as appellant.

The collision occurred after nightfall on September 20th, 1950, about 14 to 16 miles north of the city of Casper, Wyoming, on U. S. highway 87. Hawkins suffered injuries in the collision from which he died before he could be moved from the scene of the accident.

The action is grounded on the alleged negligence of the driver of defendant's vehicle, one Norman Patton. The allegations of plaintiff's petition regarding the matter of negligence are found in paragraphs 4 and 5 thereof and are verbatim as follows:

"That said truck and semi-trailer was, on said date, being driven *southerly* toward Casper, Wyoming, on U. S. Highway Number 87 at a point approximately sixteen (16) miles north of Casper, Wyoming, and at about 7:30 o'clock in the evening of said day, at which

time and place it was dark, the driver of Defendant's said truck and semi-trailer negligently and carelessly stopped the same on the main travelled portion of said highway at which time there were no tail lights or clearance lights illuminated on said trailer as required by law, nor was there any other kind of light or illumination to warn vehicles approaching from the rear of the presence of said truck and trailer and the said Defendant, by and through its driver permitted said truck and trailer to stand on said highway after dark ꓽ without any rear lights whatsoever and without exhibiting flars (flares) as required by law. That the negligence and carelessness of stopping said vehicle as aforesaid and the hazard to other persons lawfully using said highway was increased by the fact that said truck was stopped on a portion of said road just beyond a hill which further obscured the vision and visibility of the truck to persons approaching the same from the north so that the range of visibility within the headlights of an approaching vehicle travelling in the same direction as that in which Defendant's truck was headed was greatly limited and reduced. That the increased or aggravated danger of parking said truck after dark and without lights by reason of the terrain at the point where said truck was parked was clearly apparent and visible to the driver of Defendant's vehicle. That at the time and place above mentioned the said decedent, J. G. Hawkins, was driving a 1949 Chevrolet coupe *northerly* on said highway *in the same direction as that of the Defendant's vehicle* at which time the said Hawkins was operating his vehicle in a careful and prudent manner and with proper lights. That because of the fact that Defendant's truck was negligently parked without lights on the highway at the place and under the circumstances above mentioned, the vehicle operated by said Hawkins ran into the rear of said truck and the collision of said vehicles inflicted injuries on the said Hawkins which resulted in his immediate death.

"5. That the death of said decedent was the direct and proximate result of the negligence of the Defendant and its employees." (We have noted the conflicting allegations of plaintiff's initial pleading through the use of italics).

The defendant's answer to these allegations of negligence on the part of the defendant was that it:

"4.   Admits so much of Paragraph No. 4 of plaintiff's petition as alleges that an accident occurred on September 20, 1950, 'that defendant corporation was the owner and operator of a certain truck tractor and semi - trailer licensed as 1950 Wyoming Number 7T1421 being driven by Norman Patton' in the course of his employment in a southerly direction on Highway U. S. Number 87 sixteen miles north of Casper about 7:30 o'clock P. M. and that an accident occurred at that time, and that the vehicle operated by J. G. Hawkins, deceased, ran into the rear of said truck, and denies each and every allegation of negligence and carelessness contained in said Paragraph No. 4. of plaintiff's petition. Defendant further denies 'that said truck and semi-trailer was negligently and carelessly stopped on the main travel portion of said highway' and denies that 'there were no tail lights or clearance lights illuminated on said trailer nor any other kind of light or illumination' thereon. Defendant further denies that 'defendant permitted said truck and trailer to stand on said highway after dark without any rear lights whatsoever and without exhibiting flares as required by law,' defendant further denies 'that said truck was stopped on a portion of said road just beyond a hill which further obscured the vision and visibility of the truck to persons approaching the same from the north.' Defendant further denies that there was any 'increased or aggravated danger of parking said truck after dark and without lights by reason of the terrain at the point where said truck was parked.' Defendant further denies that said J. G. Hawkins, deceased, was driving 'in a careful and prudent manner.' Defendant denies 'that defendant's truck was negligently parked without lights on the highway' as alleged by plaintiff."

As defendant's affirmative defense to plaintiff's petition defendant's answer also stated in its second, third and fourth paragraphs:

"2.   That defendant's driver, Norman Patton, parked defendant's vehicle off the main travel portion of the Highway U. S. Number 87 approximately sixteen miles

north of Casper because of a mechanical failure of lights and thereafter immediately placed a light on the rear of said truck and that said light was on the rear of said truck at the time the accident occurred. That defendant's driver, Norman Patton, and his helper were preparing to place flares on the highway when said accident occurred and that the reason said flares were not on the road was that defendant's driver had not had time to do so before J. G. Hawkins, deceased, while driving a Chevrolet coupe in a southerly direction and in a negligent and careless manner and without due circumspection and observance collided with the rear of defendant's vehicle.

"3. That J. G. Hawkins, deceased, was driving at a speed in excess of sixty miles per hour after dark and without proper caution and thereby collided with defendant's vehicle.

"4. That the proximate cause of said accident was the negligence and carelessness of J. G. Hawkins, deceased, as more particularly alleged aforesaid."

For defendant's second affirmative defense it reincorporated all the allegations contained in paragraphs 1, 2 and 3 of its first affirmative defense and its paragraph "2" averred:

"2. That if defendant's driver was in any way negligent in the stopping of his vehicle on Highway U. S. Number 87 approximately sixteen miles north of Casper as more particularly alleged in plaintiff's petition, that the negligent and careless operation of a certain Chevrolet coupe by J. G. Hawkins, deceased, contributed to said accident."

The reply of plaintiff to defendant's answer denied as follows:

"each and every allegation constituting new matter contained in said Answer, or any part thereof."

The confused state of the allegations appearing in plaintiff's petition would seem to have been cured both by defendant's answer and the proofs submitted in the

case. We shall, therefore, take it as an established fact in the case that both defendant's vehicle and the automobile of J. G. Hawkins had each been proceeding in a southerly direction towards the city of Casper when the accident occurred. Defendant, in the course of the trial, made two motions for a directed verdict, one at the close of plaintiff's case which reads as follows:

" * * * at the close of the plaintiff's case the defendant moves the Court for a directed verdict for the reason and upon the following grounds: That the plaintiff has failed to show any negligence on the part of the defendant Loffland Brothers Company; that the plaintiff has failed to substantiate the allegations of negligence set forth in her petition; that the testimony submitted by the plaintiff shows beyond a question of a doubt the contributory negligence of the deceased Hawkins, driver of the vehicle a '49 Chevrolet that ran into the rear of the Loffland Brothers truck and trailer. "The evidence conclusively shows the speedometer reading of between 70 and 75, terrific·speed as evidenced by the damage done to the truck and the car. The fact that there were no skid marks of any kind indicating the application of brakes by the car driven by Mr. Hawkins, the fact that there was evidence of the use of beer as testified to by Patrolman Collier, marks on the can still being noticeable at the time Collier arrived at the scene of the accident.

"The evidence further shows by the evidence submitted by the plaintiff that the employees of Loffland Brothers did all that any reasonable man would have done under the circumstances and that there was no negligence on their part, that there was more than 20 feet of surface of the highway left for passing traffic.

"The evidence submitted by the plaintiff further showed that the driver of the Loffland truck, Patton, stopped the truck promptly and immediately when he discovered the condition of the lights on the trailer and that he pulled as far to the right-hand side of the highway as he could safely drive; that according to the testimony of Collier his right duals were on the two foot shoulder of the highway; that at all times the

headlights on the truck were burning; that at all times the lights on the top of the cab were burning; that at all times the two red lights in the top of the headache rack, visible from the rear or to the north, were burning; that the taillights on the truck were burning and that a white light was burning on the left rear corner of the trailer; that all of said lights were plainly visible for a distance of one-quarter of a mile, which was the range of visibility as shown by plaintiff's testimony; that the facts conclusively show beyond a question of a doubt the contributory negligence of the decedent; that it was not only contributory negligence but sole negligence and that in line with the authorities of the State of Wyoming where reasonable minds cannot agree and there is no question as to the negligence, it is not a jury question but a law question. We, therefore, move that we have a directed verdict at this time for the stated reasons."

This motion the court overruled. Thereupon counsel for defendant introduced evidence in support of its own case and at the conclusion of all the evidence submitted in the cause made another motion for a directed verdict in these words:

" * * * at the close of the case, both parties having rested, the defendant desires to renew its motion made at the close of the plaintiff's case and now moves the Court for a directed verdict for the reason and upon the following grounds:

"For all the grounds stated in the previous motion and specifically reiterating at this time that the evidence conclusively shows sole negligence on the part of the Hawkins driver in that he drove down the highway into the Loffland truck; that at the time of the accident there was a light burning on the left rear corner of the trailer, headlights were burning casting a reflection on the highway, cab lights were burning, two red lights were burning in the top of the headache rack visible from the rear of the trailer and from the highway to the north, the clearance lights on the truck, not only at the back of the truck but at the sides, both sides, of the front of the truck on the fenders; that there were two reflectors that were clean and visible at the rear

of the trailer; that there were five red glass lights (in) which the lights were not burning but that the evidence showed the red glass acted as reflectors; that there was a sixth light called a stop light or brake light that also had a red glass in it; that in spite of all of this warning on the highway the Hawkins car ran into the truck, made no effort to avoid it, to avoid the collision, did not swerve and did not apply his brakes; that this testimony is absolutely uncontradicted in the record.

"On the question of contributory negligence for the purpose of the motion, assuming that there was negligence on the part of defendant's employees in not putting our flares, it is still the defendant's position that the contributory negligence of the deceased Hawkins in doing as I have just stated in detail without repeating in the negligence phase, that such action was contributory negligence and that, therefore, by such action it is not a jury question but is solely a law question."

This motion also the court overruled and the defendant has saved its exception thereto and has also assigned this ruling as error.

We cannot review the ruling of the district court made by it on the first motion, but the second one presents a different question. York v. James, 60 Wyo. 222, 148 P (2d) 596. In 53 Am. Jur. 324 § 404, it is stated: "The exception to the refusal to direct a verdict at the conclusion of the whole case is not waived by submitting the case to the jury and asking other instructions. Where such a motion is denied at the conclusion of the plaintiff's case, and is reversed (renewed) at the close of the whole case, only the latter ruling can be reviewed."

In Lasky v. Smith 115 Md. 370, 80 A 1010, 1011, the Court said:

"Here the prayer was offered directing a verdict for the defendant, but, as this prayer was renewed at the close of the whole case, the refusal to grant it at the close of the plaintiff's case is not open for review now."

So the case of Walsh v. West Coast Coal Mines, 31 Wash. (2d) 396 197 P (2d) 233, 237, 238 invokes the rule and uses this language:

"Appellant has raised a number of questions on the appeal, but its principal assignment of error, and the one we shall first consider, is the ruling of the trial court denying appellant's motion for a directed verdict made at the conclusion of all the evidence. In considering this question, we have in mind the well-established rule that a motion for a directed verdict admits the truth of the evidence of the party against whom the motion is made and of all inferences that reasonably can be drawn from such evidence, and requires that the evidence as a whole be interpreted most strongly against the moving party and in the light most favorable to the opposing party."

This Court in Johnson v. Vukelic 67 Wyo. 1, 17, 18, 20, 213 P (2d) 925 defining the term "contributory negligence" has adopted the language used in section 463, page 1227 of the Restatement of the Law of Torts which deals with the matter thus:

"Contributory negligence is conduct on the part of the plaintiff which falls below the standard to which he should conform for his own protection and which is a legally contributing cause, co-operating with the negligence of the defendant in bringing about the plaintiff's harm."

In the case last cited this court proceeded to say also:

"The burden of proving plaintiffs' contributory negligence was on the defendant, and a finding against defendant on the issue cannot be distributed (disturbed) in this court unless we can say, as stated in Ries vs. Cheyenne C. & T. Co. 53 Wyo. 104, 118, 79 P (2d) 468, 473 that 'reasonable men can draw but one inference which points unerringly to such negligence.' However, this rule in regard to the burden of proof does not necessarily mean that defendant must produce evidence on the issue. Plaintiff's own evidence may clearly show his own negligence. See Cook v. C. B. & Q. Rly.

Co., 18 Wyo. 43, 102 P 657. This frequently happens in collision cases, where the plaintiff is making out a prima facie case on the issue of defendant's negligence must show his own conduct at the time he was injured."

The same case also adopts the language of the Restatement aforesaid in section 480 p. 1257, 1258, which deals with the matter of a "Negligently Inattentive Plaintiff," and refers to Mr. Parmele's exhaustive notes in 92 A.L.R. 47, 119 Id. 1041, 171 Id. 365. This court quoted the language of said section 480 which states:

"A plaintiff who, by the exercise of reasonable vigilance could have observed the danger created by the defendant's negligence in time to have avoided harm therefrom, may recover if, *but only if,* the defendant

    (a)  knew of the plaintiff's situation, and

    (b)  realized or had reason to realize that the plaintiff was inattentive and therefore unlikely to discover his peril in time to avoid the harm, and

    (c)  thereafter is negligent in failing to utilize with reasonable care and competence his then existing ability to avoid harming the plaintiff." (Italics supplied.)

This quotation from the Restatement aforesaid was followed by this court's remark "we accept this as the correct statement of the rule to be followed in the case of an inattentive plaintiff." This court thereafter in the same case also pointed out that:

"What we have said on the contributory negligence issues makes clear our opinion that plaintiff 'by the exercise of reasonable vigilance could have observed the danger created by defendant's negligence in time to have avoided harm therefrom.' The burden of proof was on the plaintiff to establish the facts, stated in clauses (a) (b) and (c), necessary to permit a recovery."

On the point of inattentiveness of a plaintiff as pertinent in the case at bar this court has heretofore approved the rule that, as set forth in the case of Chapman v. Ewing 46 Wyo. 130, 136, 24 P (2d) 687:

" 'A person is presumed to see that which he could see by looking. ***He will not be permitted to say that he did not see what he must have seen, had he looked, as Mr. Justice Toole said in Grant v. Chicago, M. & St. Paul Ry. Co., 78 Mont. 97, 252 P. 382, 386. 'The duty to keep a lookout includes the duty to see that which is in plain sight.' Pollard v. Oregon Short Line R. Co., 92 Mont. 119, 11 P (2d) 271."

See also Galicich v. Oregon Short Line Railroad, 54 Wyo. 123, 87 P (2d) 27; Huddy Vol. 3-4 Encyclopedia of Automobile Law section 49, page 91. So in Bottenberg Implement Co., Inc. v. Sheffield, 171 Kansas 67, 229 P (2d) 1004, 1007, 1008 the court concludes its opinion thus:

"A driver on a public highway has a duty to look ahead and see vehicles and objects in his line of vision and in case of accident he is conclusively presumed to have seen what he could and should have seen in the proper performance of his duty. Gabel v. Hanby, 165 Kan. 116, 193 P (2d) 239. Under the findings nothing prevented appellee's driver from seeing appellant's truck and either stopping his own truck or so operating it that he could have passed on the left side as there was ample room to do, as disclosed by the findings."

Where an automobile ran into a truck, which was standing disabled on the highway, unattended, the driver thereof having left it and gone to a house ¾ miles distant to telephone and get help to move it, and while he was absent plaintiff's automobile struck it and plaintiff and his wife were injured and the truck was knocked into the ditch or borrow pit from the paved highway, it was urged that the accident was caused by the negligence of the defendant in leaving the truck upon the paved portion of the highway un-

attended. Ordering a reversal of the judgment below the Supreme Court of Iowa very sensibly remarked in Scoville v. Clear Lake Bakery 213 Ia. 534, 239 N. W. 110, 112 that:

"The only function to be served by lights, or by an attendant would be to warn travelers of the presence of the obstruction in the road. Such ground of negligence could not be available to a plaintiff, who saw the truck for hundreds of feet in his approach thereto, and had no need of further warning. It was the duty of the defendant to remove his 'dead' truck from the pavement with reasonable promptness. The defendant was engaged in that very effort at the time of the collision. No claim is made in pleading or argument that the defendant was not diligent in that regard. Nor does it appear that the 'dead' truck was the proximate cause of plaintiff's injury. Though the question of proximate cause, like that of negligence, is usually one for the jury, yet it is such only when the evidence warrants doubt thereon. In this case, the evidence introduced by the plaintiff himself discloses affirmatively that the proximate cause of plaintiff's injuries was other than the alleged act of defendant.

"Defendant's motion for a directed verdict at the close of the evidence ought therefore to have been sustained. "The judgment below is accordingly reversed."

It remains only to examine the material and pertinent evidence of the plaintiff together with the defendant's evidence not in conflict with it on what we regard as the controlling point in the case, viz: whether plaintiff's intestate was guilty of contributory negligence.

Norman Patton, the driver of defendant's truck, was called by plaintiff for cross-examination as an employee of the defendant company. He stated that James Herron was also in the employ of the defendant on 20th September, 1950, serving as a helper on defendant's truck. The truck was a West Coast special with a 200 Cummings motor, had tandem drivers, tandem axle on the trailer; 1224 tires on the tractor; the tractor alone

weighed approximately 37,500 lbs. and the trailer weighed approximately 16,600 lbs. unladen weight; approximately the total weight of 27 tons. The tractor was about 30 ft. long; the overall length of the truck was about 54 ft. Patton first learned that the lights on the trailer were not working immediately before he stopped the truck; that they had been working prior to that time; he was driving probably between 40 and 45 miles an hour prior to the time of stopping when he noticed that the lights were out. He braked the truck to a stop, stopping it immediately, and from the time he started stopping the truck until he got it stopped was approximately two minutes. Herron was sitting in the seat beside the driver, Patton. Patton did not put flares out prior to the collision although he had them on the truck. After he stopped the truck Mr. Herron got out on the right-hand side and Patton got out on the left. He also kept a lantern right on the floor board of the cab of the truck for such emergencies as that and he took the lantern out; he noticed that three cars were coming down the road so he got out and flagged them; he told Herron to get something with which to tie the lantern to the back end of the truck while he flagged these three cars by; finally Herron found a piece of soft rope and they took it around the back and tied it on to the chain setting it there at about 45 degrees with the light pointing towards the ground in order to keep the glare out of anyone's eyes of incoming traffic. Patton took the lantern and tied it on and then started after the flares; he walked probably ten or twelve feet up along the side of the trailer on the inside of the road next to the yellow line and he told Herron at that time "We'd better get out of the way, we had better get out from behind this just in case . . . " Herron walked around the right hand corner and both of them started after the flares at the same time so one of them could take the flares down the road and the other one

go back; and at that particular moment Hawkins hit the back of the truck after a lapse of three or four minutes from the time they stopped the truck and got out of it until Hawkins hit the rear end thereof. The lantern which Patton had on the floor of the truck was an oil field safety lantern, a six volt affair. It had two bulbs for safety, if one went out the other could be used. It was as good as any ordinary white light. It was not equipped with any red color or any kind of a signal. Patton turned the light from the lantern down at a 45 degree angle from the back of the trailer towards the center of the road. This made a patch of light on the road anywhere from four to six feet. The trailer was 8 ft. wide. The outside of the tires to the edge of the oiled portion of the road was approximately 4 ft. The bed of the trailer did not extend out, over or beyond the wheels of the trailer; the truck was about half way on and half way off the oiled surface of the highway. At this point the shoulder of the road was about four or five feet. Patton never noticed anyone coming at that particular time when he got out of the cab of the truck and opened the door and looked back —he always did that to see if anything was coming— and this was when he grabbed the lantern. He got out on the center side of the road with the lantern in his hand and went to the rear of the truck about six or eight feet behind the trailer. After Patton flagged three cars and a truck past his own vehicle he then took a piece of soft rope and hung the white lantern on the left rear corner part of the trailer. At that time there was no light burning on the trailer except the lantern which had hung there. Flares were kept under the driver's seat of the cab. Patton never got out the flares before the collision occurred between Hawkins' car and the truck. It was after Patton hung the lamp on the truck and was going back toward the cab that the collision occurred. Hawkins was driving

on his own side of the road fairly well to the center of it; at least the right two thirds of the front of Hawkins' car came in contact with the rear end of the trailer. The oiled surface at the collision point was approximately 27 feet wide. Hawkins was driving more to the right of his half of the road. If Hawkins had moved clear over to the center line and continued forward he still would have hit the back of the truck. That is true because he hit more than 3 ft. of the trailer with his car. Patton made no attempt to flag down the Hawkins car after he had hung the lantern on the back of the truck. Hawkins was driving a Chevrolet business coupe.

Mr. Bustard, the Natrona County Coroner, testified that Hawkins had massive crushing injuries to the chest with multiple rib fractures, lung perforations and ruptures of the great vessels of the chest as well as multiple lacerations of a minor nature and contusions.

Mrs. Hawkins testified the Chevrolet car was in good working condition; the lights were working, the brakes were working and it was in good running order. Hawkins drove around 55 or 60 miles an hour, he never went really fast while she was with him.

E. L. Collier, state highway patrolman, of Wyoming, testified that he had been a highway patrolman in Wyoming for more than 12 years and was such patrolman on September 20th, 1950. He made an investigation of the collision which occurred between defendant's truck and a passenger car north of Casper on the night of September 20th, 1950. That where the collision occurred the highway has an oiled top road with wide gravelled shoulders; from the scene of the collision the grade of the highway is uphill to the north; towards Casper there is a slight downhill grade. That from the

crest of the hill to the north it was about a quarter of a mile, approximately to where the collision occurred. There is a turn-off to the right and left of the highway, slight approaches—side roads. The width of the oiled surface of the highway at the point of the collision was measured by tape at 27′; this was done several times. That the day before the trial he again measured the width of the oiled mat at 24′ edge to edge at the scene of the collision; that the distance from the junction of highways 87 and 20 was 14 and 8/10ths miles as measured during the course of a trial recess. That 30 ft. to the north of where the collision took place is a roadway upon which the defendant's truck could have been put off the highway; that at a point approximately 3/10ths or 4/10ths of a mile south of where the accident occurred the road has just a slight grade and then it levels off into a wide spot where the truck could have been put off the highway completely. When Collier arrived at the scene of the accident the night it occurred the truck was parked with the right wheels off on the shoulder of the road and part of the truck and trailer on the highway; the Chevrolet coupe had run into the left rear of the trailer more or less under the bed of the trailer and the impact would have been incurred on the rear dual tires of the trailer so that it forced the wheels of the trailer around completely; that the front end of the Hawkins' car was completely mashed back in—that would be more to the right side of the car than it would be to the left. The Chevrolet car had not been moved when the patrolman arrived at the scene of the accident. It was in the right lane of traffic as it proceeded towards Casper. To Collier it seemed to be about four feet from the left rear end of the tractor—over to the center of the highway in its own lane of traffic. To pass the trailer as it was then parked a car would have had to go to the left-hand side of the center line going in the direction toward Casper;

the same direction that the Hawkins vehicle was travelling. It did not rain at all while Collier was at the scene of the accident. On the first day of the trial Collier measured the width of the oiled mat highway at the point where the collision occurred and it was 24′ 4″; that was the black top from edge to edge. The taillights on the truck would be more or less obscured by the semi-unit itself.

After Collier arrived he distributed fusees completely up and down the length of the highway on the east side and had different people there put them up for him. A fusee is a warning signal used by railroads and by patrolmen at scenes of accidents. To the north about a quarter of a mile, you go over a little rise when going north down into a valley out of sight and then rise back into sight on a little higher hill again; the country is "rolly" all the way. The distance of visibility of a car on the south side of the crest near the scene of the collision was about 2.½ tenths miles. There is another hill rise some distance beyond the first one that you can see on over, and then you drop down in a valley, and back up on another crest of a hill. A mile or a mile and a half north you come over the rise, drop down, go up on a rise and back down to the scene of the accident. The cars coming from the north would approach the scene of the accident and be on top of it at a pretty fast speed. Collier was worried and for that reason spread the flares up and down that road and kept them there. His patrol car was parked to the north of the Hawkins vehicle. After the fusees were out and burning one driver almost struck the rear end of Collier's patrol car as he came over the top of that hill. His patrol car was headed in the same direction as the Hawkins' vehicle but parked north and back of it.

On cross-examination the same witness stated there was another car—a car with a lady and little children

in it and another car ahead of his; that he was about three car lengths north of the collided vehicles. That was where the car from the north almost ran into the patrol car. Collier would say that the driver of that car was ignoring the burning fusees that were spread out; that he had put fusees almost to the top of the crest of the first hill and *his car was approximately ¼ of a mile or 1320 ft. from the crest of that hill.* Collier stated that he was familiar with the headache rack on the top of a truck. The headache rack is higher than the head of a man by about three or four feet and there were two red lights—red rear and amber to the front burning when Collier arrived at the scene of the accident. They were burning in that headache rack. *These lights should have been visible even further back than the quarter of a mile north.* (Italics supplied.) On the night of the accident Collier determined that there was more than 20 ft. of surface of the road which could be used for passing vehicles alongside the stalled truck and trailer. It seemed to be about four feet from the side of the truck to the center line of the highway. The tractor and the trailer were more or less in line. The rear wheels of the trailer were knocked out so that they were visible beyond the bed of the trailer—this was caused by the impact of the two vehicles. There was more than 20 ft. of road surface for passing space. The road going off the highway 30 ft. to the north of the scene of the collision was not built up as a turn-off. In fact it was just two trails going down the shoulders of the road where cars drive in; that the side of the road and the borrow pit was wet and muddy. The shoulder of the road was soft so the track of a heavy vehicle could be seen. A heavy vehicle could not have been driven down into that muddy borrow pit on this trail across it without getting stuck. A truck weighing 37,000 lbs. would be stuck; Collier could not have pulled it out with a patrol car. In going down into the borrow

pit the driver would not turn the vehicle over. There would have been a turn-off from the highway just a little less than a mile—about 9/10ths of a mile to the north.

There was a beer can in the Chevrolet car with a little liquid still in the bottom of the can which had been opened with an opener used for opening beer cans with the triangular shape in it. Around one of the spots that was opened in the can appeared marks as though they were impressions of lip marks.

There were no skid marks on the highway to indicate the application of brakes on the Chevrolet. Quite extensive damage was done to the rear end unit of the trailer; the tandem wheels were completely twisted around. On the left hand side of the trailer one of the axles was broken; the speedometer needle of the Chevrolet car indicated somewhat between 70 and 75.

*Redirect-examination:* That in handling the remains of Mr. Hawkins, Collier could not smell any beer or alcohol on him. Collier would not say that the beer can was evidence that Hawkins was drinking. Collier did not know whether the lights on the headrack were burning *at the time of the collision* as he was not there. There was not 20 ft. of clearance on the oil mat from the easterly point of the trailer to the easterly edge of the oil mat. The back of the trailer had a greyish tint to it from the water which had been thrown up against it.

*Cross-examination:* There were two reflectors on the back of the trailer also and they were intact. The level portion of the shoulder on the east of the oil pad immediately opposite where the truck and trailer was stopped was about 3½ ft. The distance of the gravelled portion to the level part of the shoulder on the west side where the truck was parked was two feet. At the

time Collier arrived at the scene of the accident the right wheels of the trailer with reference to the west edge or the right-hand edge going towards Casper were off on the shoulder of the road, both dual wheels were on the shoulder of the road beyond the two feet referred to above. There was a little better than 20 ft. of passable space east of the trailer. Part of that included the shoulder on the east side hard surface; in other words that would be 20 ft. of oil mat and shoulder that was usable to the east of the truck for passing as hard gravelled surface of the shoulder extending on to the oil mat. That is, the truck was 8 ft. wide, 2 ft. of the truck was on the shoulder and 6 ft. of the truck was on the oil pad. The oil pad was 24 ft. wide and that left 18 ft. of oil pad and 3½ ft. of shoulder on the other side.

Harry Laatsch testified that he was at the scene of the collision in which Hawkins lost his life. Laatsch was coming from the north going south to Casper. Laatsch stated there was a bigger hill as you approached the scene of the accident and then you went down in a little valley and came up on a little hill. When he was going over the top of the big hill and coming down it for a ways he could see over the little hill. That when he came over the crest of the little hill the light on the truck was so bright *he could not see a thing.* (Italics supplied.) He was watching it and kept blinking his lights, figuring it was a car with one light; that he was slowing up and just before he got to the scene of the accident another car was standing in back of the scene of the collision a Buick with taillights on; that if it had not been for the taillights he would have crashed right into the back end of this other car because the spotlight on top of the cab was shining down the road and *he could not see a thing;* (italics supplied) that he told the driver of the truck a number of times to

turn that light out before somebody else would run into the back of the rest of the cars because *he himself could not see a thing with it on.* (Italics supplied.) That when Laatsch stopped he saw defendant's truck, Hawkins' car and this Buick. There was one other car behind the Hawkins' car; the bright light he described was on top of the cab as part of the truck and headed north in the direction from which he came. That he had to apply his brakes as hard as he could within the range of his visibility. There was no car coming from the other side and he stopped ahead of the truck and backed up, that is, he went on by and then came back in bringing his car to a stop.

*Cross-examination:* Laatsch estimated the distance from the top of the crest of the hill immediately north to the scene of the accident to be about a quarter of a mile. *The spotlight on the cab of the truck blinded Laatsch as he came that quarter of a mile.* (Italics supplied.) He saw the spotlight from the further hill but did not change the speed of his car until he came over the last little hill crest. He was travelling right at 60 miles an hour. He could not see any other lights around the spotlight. *He could not see a thing.* (Italics supplied.) He kept on travelling towards that light and slowing his speed at the same time, but did not use his brakes until he got pretty near the truck at the scene of the accident. There was nothing on the left side of the highway to block his passing the Buick or the wrecked vehicles. The left side of the highway was clear when he stopped his car about 50 ft. ahead of the defendant's truck and then backed up to it. The headlights on the truck were burning; he did not notice whether there were any taillights on the truck. The only thing he noticed was the bright light.

*Redirect-examination:* As Laatsch came over the crest of the hill and observed the bright light shining

in his face he let up on his gas and started blinking his lights; his car gradually slowed up. He continued to slow down right on down the hill and he was still going at a good clip *when he came up to the taillights of the Buick. He managed to turn around and avoid it.*

James W. Herron stated he was a helper on the defendant's truck. Norman Patton was in charge of the truck and Herron obeyed his instructions. After they had hung the lantern on the back end of the trailer Patton told him: "Let's go up to the front of the trailer and get our flares out now." Herron had started up from the back of the trailer when the accident happened and he was about 10 ft. up from the back of the trailer coming towards the tractor when the collision occurred. He went from the northeast corner of the trailer to the northwest corner and then up towards the front. He walked 8 ft. to the far corner and then on to the front of the truck a few steps. After he had taken 6 or 8 steps, to get the fusees, towards the front of the trailer after hanging the lantern the Hawkins car struck the truck. He remembers seeing lights of the Hawkins car coming over the big hill and he remembers that after the car came over the big hill the lights disappeared. The big hill crest has been identified as being one or one and a half miles to the north. He had just started to walk up there to the cab of the truck and when he was about 8 or 10 ft. going towards the tractor he happened to turn around and then noticed the bright lights right in his face from the Hawkins car and they blinded him just as he turned around. After that it was just a second before the collision. During that time Patton and Herron were both headed for the tractor to get the flares out. Patton was on the other side of the trailer, the driver's side, heading toward the cab to get the flares and he, Herron, was on his side of the trailer which would be the right side

of the trailer headed south. After they had hung the lantern and while Patton was still at the rear end of the trailer he heard Patton say: "Get out from behind the truck just in case . . . " and that was when he started up toward the front of the truck; neither he nor Patton gave any signal of any kind with their hands or any flare signal to Hawkins as he approached.

Here plaintiff rested and the first motion for a directed verdict was made and overruled.

*Direct-examination of Norman Patton:* The headache rack is a protection in case the winch line breaks. When dragging something that is pretty heavy or something that would accidentally come on over when you are pulling something over the back and it gets away from you it will run up against the winch. The headache rack is more or less a winch protection and a cab protection. There was a headache rack on the equipment that night. There were lights on that headache rack at both corners which would be almost flush with the side of the cab. They ran straight up and then there was a pipe running across to join these two and the wires ran up through one pipe and out on top to the corner lines. There were two-way lights, amber in front and red behind. The lights were put on the inside of the pipe to keep them from getting broken, and the truck involved in the accident was thus equipped with headache lights which were burning on the night of the accident. They were burning when the truck was stopped on the highway before the collision. They were burning also throughout the collision. Patton's truck also had headlights and clearance lights. He had a spotlight and fog lights; clearance lights are the ones on the outside of the bed of the trailer; the side clearance lights are practically the same as the taillights only they are on the corners and on the sides of the equipment. Both the trailer and truck had side-

lights. They were protruding out there far enough so anyone looking directly from behind could see them. They could be seen and the light is red as they showed from the rear. On the back its red and on the front corners it is amber. There were two clearance lights that were burning on each side of the truck; on the rail that goes around on the side of the bed. If anyone was 100 ft. in the rear of the trailer looking at the trailer and truck one could see the clearance lights. There are clearance lights on both sides of the tractor bed of the truck. The clearance lights on the trailer were the ones that caused the driver of the truck to stop. They had gone out. On the corners of the trailer there is an amber reflector besides the lights and on the back right under the tailroll there is a red one; there is one on each corner of the back. The taillight on the rear side of the trailer is of red glass. There were six lights counting the taillights across the rear of the trailer, all of them were red reflector lights each one equipped with red glass and a bulb. There were two reflectors on the rear of the trailer. Patton when he started out to begin the trip to Casper checked the lights and all the lights on the trailer were working; clearance, taillights and all. On the top of the cab ahead of the trailer there are four lights—, what they call a cluster. One on each corner of the cab on top and two more to the center. Those lights were burning. It was approximately 200 yards from the time he noticed the trailer lights were out to the place he stopped. All the right hand side wheels were off the pavement and on the shoulder when the truck was stopped. All of the back trailer wheels and also all the wheels of the tractor were off the pavement on the right or west side of it; for two feet the shoulder was gravel and it was fairly soft when the truck stopped. If Patton had pulled off even two more feet he would have been into the mud starting down into the slope. The truck would

probably have slid off there and into the borrow pit. Patton had about 1½ tons of pipe as a load which sat up on the trailer about 3½ ft. The lights in the headache rack are about 4½ ft. above the bed of the truck. These lights cannot be covered by the load back of the tractor. When he started to tie the lantern on the back of the truck there was no traffic approaching between him and the crest of the hill. It was three or four minutes that it took to flag three cars past and then tie the lantern on the back of the truck. He went on the highway to the left rear corner to flag these vehicles past the truck. Patton first saw the Hawkins car after he had finished tying the lantern on the trailer and then the lights of the Hawkins car disappeared in that first little draw there ;that is when Patton started around the side of the truck and Herron started around the other side. When he started to leave the back of the truck the Hawkins car was about 250 or 300 yards to the north. The minute he saw the Hawkins car after finishing tying the lantern on there he could both see and hear it, and he also saw it coming between 200 and 300 yards away and it was then he went up alongside the trailer and truck to get the flares. The other cars that came from the north when they were flagged by, slowed down to not much over 25 or 30 miles an hour when they went around on the other side of the yellow line. There was no indication on the highway of the application of brakes. At the time of the accident Patton had been driving trucks for about ten years. It was about four feet from the left side of the truck to the yellow center line in the approximate center of the highway. There was no traffic approaching from the Casper side or from the south at the time of this accident and there was no obstruction on the east side of the highway and the four feet remaining of the west portion of the highway. The first car that stopped was the one that called

the patrolman. He was driving a new Buick; the next car sitting behind that had a woman in it and Patton remembers he borrowed a flashlight from her; she left there before the patrolman arrived. It was half an hour from the time of the accident until Mr. Collier, the patrolman arrived. The Chevrolet car of Hawkins had not been moved or changed in any way when Collier arrived. Nothing was moved until permission was obtained from Mr. Collier. The borrow pit in the rear where Patton stopped his truck was wet and muddy. He could not have driven his truck into the borrow pit near the scene of the accident and have gotten out under his own power. There were tool boxes full of tools in the Hawkins car and they weighed in the neighborhood of 800 lbs. and that equipment—after the accident—was right directly behind Mr. Hawkins against the back of the front seat. The oil field lantern was on the truck at the time of the collision and it was damaged and the light put out in the collision. The lantern that he placed on the back of the truck was in good condition, had batteries and bulbs in the space for bulbs. As a result of the accident the rear axle of the trailer was broken in half and the main stabilizing pin was broken and the two spring shackles on the left axle at the left side. The rear axle at the left side was turned loose and one tire was broken. The axle under the trailer was a Timken.

*Cross-examination, Patton:* The shoulder of the road looked to be about 4 ft. to where it really started down to the borrow pit. Patton did not notice at the time he stopped anyone coming behind him. He looked after he opened the door of the cab. He stopped the truck within approximately 200 yards at about 45 miles an hour. He could see the lights over the truck cab were burning prior to the time that he stopped. The side lights were on; he saw them in his mirror. The lights

on top of the cab and the side lights on the tractor are all on the same switch and the two side lights were on and he also saw on each right fender an amber light for clearance lights; they were both on. The minute he stepped out of the cab he saw that they were all on. As he grabbed the lantern he looked up and the lights were all on; this was because they were all on the same switch. The purpose of stopping was to fix the trailer lights in an endeavor to observe the law. There were five lights across the rear of the trailer plus the tail-light which made six in all. None of these were burning. The two lamps on top of the headache rack in back cannot be missed because there is no obstruction behind it or in front of it. After Patton had waved past the three cars and a truck, Herron brought the rope back to him for tying the lantern on the truck; Patton made no attempt to signal Hawkins with the lamp while he was tying it on the rear of the trailer. He figured that when he turned the light up that would be enough warning with the rest of the clearance lights; the lantern was a stationary white light—there was no red light in or on it. The lantern was tied to a chain and was flush up against same part of the trailer. The relative speed of the Hawkins car from the first time Patton heard it appeared greater than the other cars and the truck which were flagged by. The first time Patton heard it was when he was engaged in tying the lamp on to the chain on the back of the trailer. From the time Patton heard Hawkins car until the time when he first saw the car was probably 1½ minutes. When they finished tying the lamp on the trailer Patton could see Hawkins' lights and just as he finished and started around the side of the trailer he got a glimpse of the lights of Hawkins' car and he went on towards the cab for the flares. He did not pay any more attention to Hawkins. There was nothing he could do to avoid the crash. He could not have signalled with

the lamp because he would have had to tear the lamp off the chain which would have been a hard thing to do. The left front side light on the Chevrolet was not broken. The bulk of the impact was taken on the radiator from the left front side light of the Chevrolet to the right side of it. Patton moved the tool box over to the opposite side of the Chevrolet car so that he could slide the front seat back and get that weight away from Hawkins to enable Patton to get Hawkins out from around the steering wheel. The tool boxes apparently come forward settling right behind Hawkins, and in the crash they had all shifted ahead.

*Redirect-examination of Patton:* While Patton was slowing down after he saw that his trailer lights were out there was no traffic approaching from Casper that he met. The spotlight on the top of *the cab was not burning before the accident.* (Italics supplied.) The headlights of the Chevrolet car were not visible at the time when Patton and Herron started around the trailer towards the front of the truck. When Herron turned to look at the Hawkins car it was right after he had walked 8 ft. from the rear of the trailer and he turned around just at the time, it seemed, of the impact. The first thing that was done after the crash was to try and get Hawkins out of the car. The seat was pushed up against Hawkins and the weight of the tool boxes was right behind him. The first car to come after the collision was headed south, the same direction he and Patton were going. He was the driver that was asked to call the highway patrol. The next car was a Buick with a lady and a couple of small children in it. She must have stayed there at least 15 minutes. She was parked within six or seven feet of the Hawkins car. There were three amber lights on the rear of the cab, three lights on top of the cab were amber; after Hawkins had been extricated from his car Herron

and Patton put some of Collier's flares out on the roadway. Patton was the one that got the flares out of the truck at that time after Hawkins had been taken out of his car and placed on the ground. That was the first time the reflector flares were taken out of the truck.

Sam Rogers, Assistant Drilling Superintendent for the defendant, stated he arrived at the scene of the accident around 8:30 p. m. On his arrival Collier was there, Mr. Hawkins' remains had been placed in the ambulance and Rogers did not see him. Laatsch was at the scene of the accident when Rogers arrived. At the time of Rogers' arrival the truck's headlights were on. The country round about was lighted up by flares both back and in front of the truck. All lights were burning on the head rests and everything but the trailer lights. He and Mr. Collier measured the distance from the left front wheel of the truck to the edge of the pavement and it was 21 feet. The trailer and truck were directly in line. Collier checked the car and the back of the trailer but Rogers did not help check the back end of it. At the rear of the trailer the light of the lantern was smashed. The two reflectors, one on each edge of the trailer were there; neither one of them was broken. They were clear, just hadn't been wiped off; they were dusty but clear; there was no mud on them. The type of glass in the lamps in the rear of the trailer which were not burning was red reflector glass. None of the red glasses at the rear of the trailer were broken. There is no built-up road or turn but there is a road where the trail turns off to the right that goes through a fence where the gate is wired up. Rogers would not have wanted to have driven the truck off into the borrow pit at that particular point. Rogers did not find any built-up highway on which the truck could have gotten off the highway.

E. L. Collier—as a witness for the defendant—testified there was a work light or spotlight on the truck, owned by the defendant, but when Collier arrived it was not burning. It was turned on later while he was there and while the equipment was being moved. That light was located on top of the cab of the tractor or truck unit. Laatsch was at the scene of the collision when Collier arrived. It was at least half an hour before Collier arrived after Laatsch got there.

*Cross-examination of Laatsch:* Laatsch stayed at the scene of the accident until the ambulance left and then he left right behind it. The light was on on top of the truck somewhere—witness would not state where the light was located, whether on the headache rack or on the cab. The light would have been on either the cab or on the headache rack—he did not know whether the light was fastened on to the cross member of the headache rack or about 4″ below it.

*Collier-rebuttal:* The numerals on the speedometer are located on that model of the Chevrolet car around the glass that covers the speedometer needle. The glass of this speedometer was broken out and gone. The speedometer was not in working order when he examined it.

From the foregoing review of the undisputed testimony in the case especially bearing on the question of contributory negligence and which testimony has been set forth above rather in detail we note that about 1½ miles to the north of where the collision occurred a car could come over the crest of the hill from which it was possible to see the lights of the stalled truck of the defendant. After that the car proceeding southerly on its course would travel into a depression of the highway where no view of the road to the south could be had; the car would then arrive on the crest of a

smaller hill which was lower than the first one mentioned and which was about 1320 ft. from the scene of the collision, and from which a view of the highway to the south could be obtained for at least some distance beyond the disabled truck. From the crest of the second or lower hill there was nothing to obstruct Hawkins' view southerly on the highway between him and the defendant's truck which had these red and amber lights burning on the cab; so-called headache lights, amber and red, were also burning as well as the clearance lights on the vehicle which were likewise functioning. True, the red rear warning lights on defendant's vehicle had failed including the taillight but Patton and Herron had just completed fastening an oil field lantern—lighted by an electric light bulb and small storage batteries therein—on the rear end of the trailer portion of defendant's truck; this oil field lantern was pointed down at a 45 degree angle and cast a lighted space on the roadway of about four to six feet thereon. It is unreasonable to think that the oil field lantern after being placed on the trailer could have blinded anyone approaching from the north and no claim appears to be made that it did so. It may be further noted at this point besides that while the truck's rear lights on the trailer were out— yet they were not broken and were fashioned of reflector red glass. In addition to all this there were two reflectors on the rear of the trailer also made of red glass which were found, after the collision, to be unbroken and though they were dusty they had no mud on them.

It is apparent that Hawkins, had he looked as he should have done, could or should have seen the lights on the truck as he came over at least the crest of the hill 1320 ft. distant. Instead of slowing his car speed he evidently drove at high speed down the hill and the

collision apparently ensued. Under the authorities cited above and those presently to be reviewed it seems very clear to us that the plaintiff's intestate Hawkins was guilty of contributory negligence and that no recovery should be allowed to his personal representative. In other words the defendant's motion at the conclusion of the evidence for both parties herein should have been sustained.

Plaintiff calls attention to the fact that the witness, Laatsch, stated that as he approached the scene of the collision, driving from the north, he was blinded by a spotlight or work light on top of the truck's cab. He repeatedly said that from the crest of the lower hill aforesaid approaching the scene of the collision he was blinded by the glare of this spot or work light on top of the cab of the truck—*"he could not see a thing"*—yet, he also stated that as he drew near the truck he saw the red taillights of a Buick to the north of the truck and Hawkins' Chevrolet car, and was enabled thus to pass the stalled truck by travelling on the clear unobstructed highway to the east of these vehicles and go 50 ft. beyond them, stopping and backing up to the front of the defendant's truck as it stood on the highway. It is significant that he passed all these vehicles safely though, as above remarked, he stated "he could not see a thing." In addition it may be observed that Collier, testified without objection, that he was familiar with the headache rack on top of a truck; that that device was higher than the head of a man by about three or four feet; that there were two red lights—red rear and amber to the front—burning when Collier arrived which were functioning on the truck's headache rack and that *"these lights should have been visible even further back than the quarter of a mile north."* It is also significant that several cars including the Buick concerning which Laatsch testified had

stopped safely to the north of the collided vehicles. It appears that one of these cars was evidently driven by a women who had two small children with her. Of course none of these cars north of the collided vehicles was there when the collision occurred nor was Laatsch's car at the scene. So far as the glare of the spot or work light causing trouble it is likewise apparent that it was not being used at the time the crash took place for Patton, the truck's driver, testified on redirect examination without objection as follows:

Q. Now, you were questioned about a spotlight on top of the cab

A. Yes.

Q. Was that spotlight burning before the accident?

A. No, sir.

Q. Did you turn it on immediately after the accident?

A. I did not.

Q. When was that light turned on if it was turned on at all?

A. The first time it was turned on was when we was taking the trailer and the tractor apart; we had to have light there underneath, you know, you have to reach back under to get your fifth wheel and get it loose there.

Q. Why didn't you turn that on immediately when you stopped?

A. Well, that's not the safe thing to do, you never want to turn a spotlight on, you are not hardly even supposed to use one on the road, its against the law.

Q. If you used the spotlight, would it have blinded anybody approaching from the rear?

A. It would.

Q. And was the light on at the time of the accident?

A. No.

Q. It was turned on sometime later when you were trying to get the equipment off the highway?

A. Yes.

Plaintiff directs our attention to, and lays stress upon, the case of Hisaw v. Hendrix, 54 N.M. 119, 215 P (2d) 598, 22 A.L.R. (2d) 285. However, that case fails to present facts such as we now have before us. Quoting from page 285 of 22 A.L.R. (2d) the summary of the decision sets forth that:

"The question whether the plaintiffs, blinded by head-lights, were guilty of contributory negligence in failing to stop immediately was held to be a question of fact to be decided under the circumstances of the case, by the fact finder."

The subject of the annotation attached to that case is "Duty and Liability of Vehicle Driver Blinded by Glare of Lights." There is no proof here that Hawkins was or could have been blinded by the lights on the disabled truck or any other vehicle *at the time of the collision*. Indeed there is no proof here of there being existing glaring lights at the time of the collision. See verbatim testimony of Patton set forth above.

Before concluding this discussion we should refer to our case of Merback v. Blanchard 56 Wyo. 152, 167, 168, 105 P (2d) 272, also much relied upon by the plaintiff where this was said:

"There are many authorities announcing the rule that the driver of an automobile who fails to stop or turn aside to avoid an obstruction within the range of his lights is negligent as a matter of law. We think, however, that most of the courts recognize that this is not a hard and fast rule that must be invariably applied, and refuse to apply it when there is evidence from which the jury may find that there were disconcerting circumstances affecting the driver's actions at the time of the collision."

and thereafter it was remarked in the same case:

"When Thomas was asked why he did not see Merback's lights in his mirror when he stopped, he gave replies that the jury may have understood as meaning that he was blinded by the lights from Russell's truck; and they might have inferred that Merback's vision was also interfered with. We think that in view of these disconcerting circumstances it cannot be held that plaintiff was negligent as a matter of law in failing to avoid the collision. The question was one of fact for the jury."

It is evident that the Merback case has no application to the record we now have where there is no testimony showing "disconcerting circumstances" or as stated above that anyone was or could have been blinded at the time of the accident by any lights on the truck. It may be appropriately noted also that of the court as then constituted one member dissented because he believed that the facts shown in the Merback case established in his mind the fact that the deceased "was guilty of contributory negligence."

It is also urged for the plaintiff that a presumption that Hawkins exercised due care for his own safety entitled plaintiff to have the jury pass upon the case despite the undisputed proof that he did not exercise that care for his own safety which the law required. Cases from California and New Mexico are cited. So far as the California cases are concerned it is sufficient to observe that they were decided under statutes relative to the Law of Evidence which we do not have. See also 26 Cal. Law Review 519, 551 for an able and instructive discussion of the subject "Presumptions: Are They Evidence?" where the author criticizes the California rule as announced by some of its courts and concludes:

" * * * (7) that judicial decisions to the effect that rebuttable presumptions are evidence are utterly un-

sound and hence should be overruled; (8) that if statutes exist in jurisdictions making rebuttable presumptions evidence they should be declared in violation of the due process clauses, and finally, (9) that if such statutes are not declared unconstitutional, they should be repealed by legislative enactment."

The New Mexico cases were determined under facts not present in the case at bar. In Ineas v. Union Pac. R. Co., Idaho, 241 Pac (2d) 1178 ,1189, the trial court entered judgment on a verdict for defendants. Plaintiffs appealed the case but the Supreme Court of Idaho sustained the ruling. It appeared that at the conclusion of the case the defendant company had made a motion for non suit on the ground that the decedent was guilty of contributory negligence as a matter of law. Judge Givens in concluding the opinion delivered by him for the court said:

"It is therefore, apparent contributory negligence on the part of Ineas appears so conclusively that as a matter of law, his representatives may not recover. Allan v. Oregon Short Line R. Co., 60 Idaho 267, 90 P (2d) 707. This disposition of the vitals of the case obviates the necessity of considering other errors urged by appellants, since the non-suit should have been granted. Morris v. Chicago M., St. P. & P. R. Co., 1 Wash. 2d. 587, 97 P (2d) 119."

In Wickline v. Pennsylvania R. Co., 347 Pa. 136, 31 A. (2d) 535, 537 where there was a collision between an automobile and a train plaintiff had verdict upon which the trial court rendered judgment in her favor, she being the surviving wife of decedent. Reversing this judgment and entering judgment in the appellate court for the defendant the court unanimously stated that:

"While there is a factual presumption, when a person is killed in an accident, that he was exercising due care (Michener v. Lewis, 314 Pa. 156, 170 A. 272), that presumption gives way if the facts established by

plaintiff's own testimony show that the decedent was guilty of contributory negligence. Tull v. Baltimore & O. R. Co., 292 Pa. 458, 141 A. 263, Ray v. Lehigh Valley R. Co., 321 Pa. 538, 184 A. 445."

We may appropriately remark at this point that in Kammerzell v. Anderson, Wyoming, 240 P (2d) 893, 895 it was recently stated relative to presumptions that:

" ' * * * Accordingly, courts will not define presumptions in such a manner as to imply superiority over established facts. Where facts appear, presumptions recede. Thus, the necessity for resorting to presumptions disappears where there is direct and positive evidence upon the matter in issue.' * * * (20 Am. Jur. 163.) "

Without further extending this opinion, perhaps over lengthy now, we conclude that defendant's motion for a directed verdict at the close of all the evidence in the case should have been sustained.

The judgment below should be reversed and the cause remanded for proceedings not inconsistent with views hereinabove expressed.

*Reversed and Remanded.*

BLUME, *C. J.*, and ILSLEY, *J.* concur.

## ON PETITION FOR REHEARING

An application for rehearing was filed in this case and was denied without Opinion on February 17th, 1953.