## CHAPMAN v. EWING.

No. 1804; August 29, 1933; 24 Pac. (2d) 687).

(Rehearing Denied Oct. 17, 1933)

For the plaintiff in error, there was a brief by *Durham & Bacheller* of Casper, Wyoming, and oral argument by *E. Paul Bacheller*.

For the defendant in error there was a brief and oral arguments by *W. O. Wilson* of Cheyenne and *Edward E. Murane* of Casper.

RINER, Justice.

By this proceeding in error, Vernon Chapman, the defendant below, seeks review of a judgment rendered by the District Court of Converse County, Wyoming, in an action brought against him by Mrs. Sylvia Ewing, as plaintiff, in the District Court of Natrona County, and removed on change of venue to the county first above mentioned.

The action is one for alleged negligence on the part of Chapman in the operation of an automobile owned by him, whereby plaintiff was injured. Her petition states that the "defendant's car was parked parallel and along side of several other cars at the Lions Recuperation Camp on Casper Mountain in Natrona County, Wyoming; that at said point and time mentioned said defendant Vernon Chapman started to back his car out and did back his car out and away from said parking space, and operated said automobile in a careless, incompetent and willfully negligent manner in the following respects, to-wit:

First. That he did not have absolute or any control over said motor vehicle; that he did not look to the front or to the side of his said motor vehicle but turned his head and was attempting to look out of the window of said automobile

Second. That he drove said motor vehicle without proper regard for the rights of other persons.

Third. That he failed to give any warning by horn or otherwise of the presence and approach of said

automobile then and there operated and driven by him."

Defendant's answer, after admitting the parallel parking of his car with others, and that it was backed by him from the place where it had been parked, was a general denial of the allegations of plaintiff's petition. A jury trial was had, resulting in a verdict for the plaintiff in the sum of $7,129 upon which the judgment complained of was entered.

The facts material to be considered, as we view them, are substantially these: On the evening of July 22, 1931, the defendant with his wife, and child about ten months old, the plaintiff, and many other people, were attending a picnic on Casper Mountain, some distance from the City of Casper, Wyoming, at what was known as the Lions Recuperation Camp. The defendant parked his automobile to the north and some distance from a building designated as the "Administration Building" of the camp, in a position parallel with other cars also located to the north of said building but on ground somewhat east of defendant's car. The ground in front of the building, aforesaid, sloped considerably to the north. There appear to have been no cars parked in the immediate vicinity of defendant's car, either to the west or north of it.

Between 8:30 and 9:00 o'clock on the evening mentioned, the defendant desired to take his family home to Casper, some nine miles distant. Plaintiff, who was conversing with them at the time, walked along in their company until they all came to defendant's car. The Chapman family entered it, the defendant taking his seat at the steering wheel of the automobile, his wife sitting beside him on the front seat of the car with the child on her lap. The plaintiff, standing on the ground close beside the front door of the car, which was of the sedan type, con-

tinued the conversation through the opening made by lowering the glass part of the door. Finally, the defendant, according to his testimony, said that he would see plaintiff Friday concerning some work she desired done, and then, as the plaintiff related the occurrence on the witness stand: "Well we had no kind of salutation and didn't honk his car, the car moved and seemed to start towards me and as he did the wheel knocked me down and wheel run over my foot." The defendant says in his testimony that, after making the remark aforesaid, he put his car in reverse and backed about eight or ten feet to the rear or until the left front wheel of his car was about even with the rear wheel of the car parked adjacently and to the east of it, and then he cramped the rear of his front wheels to the right in order, as he states, "To keep from backing towards the crowd and to keep from backing down hill to a rough and stony piece of ground and to hit the road in such a way as to reach the road to town." He testified, also, that plaintiff walked along with the car some distance as it moved before he turned the front wheel. The fact of her doing so, however, is in dispute. As the car moved to the rear and swung to the right in consequence of the cramping of the front wheels, the right front wheel ran over plaintiff's right foot causing the injuries of which complaint is made. She cried out and the defendant applied the brakes of the car so quickly that the engine was stopped and the wheel remained stationary on the foot until people nearby hurriedly came forward, pushed the wheel aside, and released her.

On direct examination, the defendant testified, as shown by the following questions and answers:

"Q. What was your position in the car during the period of time you were backing to that position?

A. I was sitting in the car looking over my right shoulder thru the rear window to see that everything was clear behind.
Q. Did you see Mrs. Ewing at all?
During the time I was progressing?
Q. Yes.
A. Not after I had moved three feet."

And on cross-examination he stated, in response to the question, "You stated that you did not see Mrs. Ewing any after the first three feet, what do you mean by that?": "That I had looked to the rear and was watching to the rear." His wife testified on cross-examination:

"Q. You were looking over your right shoulder, looking out the back window?
A. My left.
Q. Did you see your husband watching back?
A. He was watching back.
Q. Both turned to the inside of the car?
A. Yes, sir."

Such other facts as are deemed essential to a proper disposition of the questions raised will be subsequently mentioned.

The only contentions advanced on behalf of plaintiff in error are that the evidence of defendant's negligence in the case is not sufficient to support the verdict and judgment, and that the verdict is excessive and the result of passion and prejudice on the part of the jury.

Concerning the first contention: Vol. 3-4, Huddy's Cyclopedia of Automobile Law (9th Ed.) 219, says:

"The driver of an automobile must exercise ordinary care in backing his machine, so as not to injure others by the operation, and this duty requires that he adopt sufficient means to ascertain whether others are in the vicinity who may be injured."

In Autio v. Miller, 92 Mont. 150, 11 P. (2d) 1039, it is stated, concerning the duty of an operator of a motor vehicle:

"The driver must look 'not only straight ahead, but laterally ahead.' Hornbuckle v. McCarty, 295 Mo. 162, 243 S. W. 327, 329, 25 A. L. R. 1508; Huddy on Automobiles (8th Ed.) p. 384, § 369. 'Moreover, a person is presumed to see that which he could see by looking. * * * He will not be permitted to say that he did not see what he must have seen, had he looked,' as Mr. Justice Toole said in Grant v. Chicago, M. & St. Paul Ry. Co., 78 Mont. 97, 252 p. 382, 386. 'The duty to keep a lookout includes the duty to see that which is in plain sight.' Pollard v. Oregon Short Line R. Co., 92 Mont. 119, 11 P. (2d) 271."

See, also, Huddy's Cyclopedia of Automobile Law, supra, p. 88. Many other authorities of similar purport could be supplied. Taking plaintiff in error's own statement of what occurred at the time of the accident as true, we think the jury was authorized to find that he was negligent in the operation of his car. When he started to back his automobile, he knew that Mrs. Ewing was standing beside it on the right side and close to its front door and that she had moved north as it moved. He and his wife both said that they looked back through the rear window of the car as it started to move northward. After he had backed the automobile a few feet, he cramped the rear of the front wheels to the right, thereby causing it to swing in a lateral direction, i. e., to the right. He did not look in that direction until Mrs. Ewing's foot was struck by the right front wheel. In brief, he did not look in the direction in which his car was moving. A single glance to the right before he turned his front wheels would have given him the plaintiff's position and afforded him opportunity to protect her, as he states his car was moving very slowly. Applying the

authorities cited above, it is apparent he did not look laterally at all—a duty which is just as imperative when backing the car as when going ahead—he did not see what he must have seen had he looked, and did not adopt sufficient means to ascertain whether others were close to the movement of the car who might be injured.

Relative to the contention that the verdict is excessive and due to the influence of passion and prejudice, we are inclined to the view that it is excessive but we find no evidence in the record which would lead us to think it was rendered through passion and prejudice.

The injury suffered by defendant in error, as described by the surgeons who attended her, was a dislocation and fracture of the second metatarsal, a fracture and partial dislocation of the third metatarsal, and partial dislocation of the fourth and fifth metatarsal bones of her right foot. The surgeons, aforesaid, made two attempts, with the aid of anaesthesia, to reduce the fractures and dislocations. The woman remained in the hospital seventeen days. Her foot was kept in a cast for four days at first, and a second cast was thereafter put on and kept so for several weeks. It was three or four weeks before she could sit up in a chair.

Concerning the final result of the injury, Dr. Keith, who had principal charge of the patient, stated on the trial that Mrs. Ewing was not able to use the foot then in a normal manner and expressed the opinion that she would never be able to use it normally. In this statement, Dr. Harvey, an associated physician and surgeon, concurred, but who, nevertheless, stated on direct examination that the final X-ray picture of the foot taken shortly before the trial showed considerable improvement over what was found on the examination immediately after the accident. Dr.

Reeves, another physician and surgeon who also was associated with the others mentioned in connection with the case, stated in his testimony, in response to the question: "What percentage of disability would you give this foot?": "I don't know, she will probably always have some trouble and considerable pain in it when she walks, I would say more than likely fifty to seventy-five percent disabled in that foot." Dr. Packard, a non-resident orthopedic surgeon to whom the plaintiff was referred by her local physician, Dr. Keith, and who specialized in that character of practice, examined plaintiff's right foot and leg on October 9, 1931. He testified, on direct examination, as shown by the following questions and answers:

"Q. From your examination made on October 9th, what would you say the length of time the pain would continue—a matter of years?
A. No—a matter of months more I would think. It would be fair to give her disability of a working woman six months from the date of injury.
Q. You mean permanent disability?
A. No—that of a working woman ought to be from six months from time of injury.
Q. What would you say as to the permanency of the injury after a period of months?
A. I would say partial disability."

Her doctor and hospital bills amount to $447.

Plaintiff in error testified that before the accident she worked out "at any house work that there is and taking care of children," receiving $2.00 per day, and that she was not able to do this work since the accident.

As indicated in Eagan v. O'Malley, 45 Wyo. 505, 21 P. (2d) 821, it is proper for us to consider verdicts in cases where injuries somewhat similar in character with that suffered by plaintiff have been reviewed, as

they may throw light upon the question at bar. This we have done, our examination disclosing that an injury of the kind under consideration now is frequently complicated with others more or less serious, and consequently, verdicts relative to them are not of material assistance here. We, however, may mention several cases where injuries of this character have been involved and which do not appear to have those complications, and which would seem to be helpful.

In Winkleback v. Great Western Mfg. Co., 187 S. W. 95 (Mo. App.), it was held that a verdict of $5,-000 for an injury to a teamster, 54 years old, earning $10.50 per week, which caused certain bones of his foot to be fractured, the injury healing as well as could be expected, rendering him unable to work for about four months and leaving a permanent flat foot, a limp, and a liability to some pain and inconvenience, where he obtained employment at pay not materially reducing his earning capacity, was excessive and would not be sustained without a remittitur of $2,000.

In Brennan v. Minnesota, D. & W. Ry. Co., 130 Minn. 314, 153 N. W. 611, 613 L. R. A. 1915 F. 11, the appellate court, in reducing a verdict of $6,225 awarded a boy of six years to the sum of $5,000, said:

"The most difficult question in the case is whether the verdict of $6,225 is excessive. Both bones of the leg were broken two inches above the ankle. There was a good recovery and both bones are firmly united, but the leg is slightly bowed and about half an inch shorter than the other. The bones of the instep were broken or crushed and there is an ankylosis of these bones which renders the instep stiff and rigid and there is something of a hump upon the instep. The foot is smaller than the other and is turned so that in walking the outer edge of the foot rests upon the ground and the great toe and ball of the foot do not. While there is some difference in the opinions ex-

pressed by the physicians, the evidence was sufficient to justify the jury in finding that the boy will probably always have a deformed foot. He can walk upon it, however, but limps in walking. The ankle joint does not appear to have sustained any material injury."

In Finney v. Banner Cleaners and Dyers, Inc., 13 La. App. 101, 126 So. 573, where the injury was caused by a truck running over plaintiff's foot and producing a fracture of the second, third, and fifth metatarsal bones thereof, requiring treatment for some ten months, the plaintiff earning $27 per week and working regularly, it was held by the appellate court that the sum of $1,250 plus hospital and doctor's bills of $113.50 was to be regarded as reasonable compensation therefor.

In the comparatively recent case of Southern Mining Co. v. Hensley, 247 Ky. 276, 56 S. W. (2d) 965, 966, concerning the question of the quantum of damages awarded an employee engaged in mine car coupling work, the court said:

"Appellee's foot was badly mashed. Several of his toes are out of alignment and he has to walk on the side of his foot. He has not been able to work since the accident. He cannot get a job, and is unable to pass a medical examination necessary to secure employment. His foot is deformed and the injury is permanent In view of these injuries, and of the mental and physical suffering which he has endured, and will endure as a necessary result thereof, it cannot be said that the verdict of $5,600 is excessive."

In view of these and other authorities which we have examined, the character of the injury suffered by the plaintiff and the nature of the ultimate disability caused by plaintiff's physicians, we reach the conclusion that the judgment of the district court should be affirmed upon condition that the plaintiff

file a remittitur in that court within thirty days after filing the mandate issued from this court, of the sum of $1,629, leaving the judgment at the sum of $5,500 as of the date thereof. Unless this remittitur is so filed, the judgment will be reversed and a new trial ordered. The costs in this court shall be taxed three-fourths to plaintiff in error and one-fourth to defendant in error.

*Affirmed on condition.*

KIMBALL, C. J. and BLUME, J., concur.

## ON PETITION FOR REHEARING.

RINER, Justice.

A petition for re-hearing has been filed in this case in behalf of plaintiff in error. We have examined the reasoning and the authorities presented with care. It is argued:

"If, as the Court holds, the operator of a motor vehicle must not only look behind, but laterally behind, in backing his machine, yet a full compliance with this rule by the Plaintiff in Error would not have disclosed the presence of the Defendant in Error, because the record shows that the portion of the machine which collided with the foot of the Defendant in Error was the right front wheel. In other words, Plaintiff in Error would of necessity have had to be looking in the opposite direction from which he was going to have discovered the presence of the Defendant in Error."

But this contention overlooks the fact manifest from the record that plaintiff in error was not only backing his car, but he was at the same time, through his cramping the front wheels thereof, swinging the vehicle to his right. In other words, he was moving

not only backwards, but laterally at the same time. He looked in one direction, i. e., to the rear, but he did not look laterally as he should have done. His failure so to look caused the accident.

We do not find anything in Chicago, Burlington & Quincy R. Co. v. Cook, 18 Wyo. 43, 102 P. 657, which aids the plaintiff in error. There was nothing in the evidence given by plaintiff which indicated that she was guilty of contributory negligence. It is said that she knew the defendant's car was to be started backwards. Even if that fact be assumed—and there is evidence from which the jury could readily infer the contrary—it does not appear that she knew that the defendant would swing his car laterally, the movement which unquestionably caused the injury. The petition for re-hearing should be denied.

*Denied.*

KIMBALL, C. J., and BLUME, J., concur.