Argued September 11, affirmed November 6, petition for
rehearing denied December 4, 1957

## CLEMENT *v.* CUMMINGS

317 P. 2d 579

*Allan G. Carson* argued the cause for appellant. On the brief were Carson, Carson & Gunnar and Douglas L. Hay, all of Salem.

*Roy Kilpatrick,* Canyon City, argued the cause for respondent. On the brief were Lytle, Kilpatrick & Shroeder, Vale, Marsh, Marsh & Dashney, McMinnville, and Edward L. Clark, Jr., Salem.

Before PERRY, Chief Justice, and ROSSMAN, BRAND and McALLISTER, Justices.

ROSSMAN, J.

This is an appeal by the defendant from a judgment in favor of the plaintiff which was entered in an action to recover damages for the death of one Opha Clement, of whose estate the plaintiff is administrator. The judgment is based upon a verdict. The action, which culminated in the entry of the challenged judgment, charged that the defendant, a deputy sheriff of Grant county, drove his car negligently and that, as the proximate result thereof, death was brought to the aforementioned Opha Clement, an occupant of the car. Mrs. Clement, the decedent, was riding in the car as a prisoner of the defendant, who was conveying her to the Oregon State Penitentiary in Salem. The action was brought for the benefit of the decedent's widower and minor children. The latter, four in number, range in age from six to eleven years.

The fatality occurred April 2, 1954, at approximately 4:20 p. m. upon the North Santiam highway immediately west of Detroit dam. The car was traveling westerly. The trip had begun in Canyon City and its destination was Salem. The car had just passed Detroit dam when it veered to the left side of the roadway and then plunged down an embankment. In addition to the defendant and Mrs. Clement, the car had two other occupants. One was Mrs. Clement's brother, Oscar Holland, who, like the deceased, was a prisoner of the defendant on his way to the Oregon penitentiary; the other was a Mrs. Patricia Elliott, a deputy sheriff of Grant county, who was serving as matron in charge of Mrs. Clement upon the trip. Mrs. Elliott had been hospitalized for two weeks prior to the day of the trip and intended to continue on into Portland after the prisoners were delivered to the penitentiary.

Mrs. Clement and her brother were seated in the

rear seat of the automobile. She sat behind the defendant and her brother was to her right. Mrs. Elliott, the matron, was to the right of the defendant in the front seat. Neither of the prisoners was handcuffed nor in any way shackled.

The North Santiam highway is of standard construction and is hard surfaced. It has shoulders which are made of small crushed rock. The north shoulder, being the one which is material to the issues before us, is four to six feet wide and about one inch lower than the pavement. Beyond the shoulder and parallel to it there runs a ditch, three feet deep, which receives tailings that drop from the adjacent embankment. On the day of the accident rain had fallen, but at the time of the fatality visibility was good.

We have mentioned the fact that after the defendant's car had passed Detroit dam it crossed to the left side of the roadway and then pitched down a declivity. The drop was 200 feet. In the disaster Mrs. Clement lost her life. The defendant and Mrs. Elliott sustained injuries of such severity that each was rendered unconscious and, at the trial, could not recall any of the incidents that occurred immediately before or during the misadventure. Holland, who also received severe injuries, remembered events that transpired prior to the fatal plunge and, as a witness for the plaintiff, narrated them. We shall now give effect to his and the other testimony as we recount the evidence.

Holland estimated the car's speed as 50 miles an hour at about the time of the fatality. Shortly before the fatal plunge, the car began to move onto the north shoulder. At that point a curve in the highway is encountered. The car continued on the gravel shoulder for at least 300 feet. By that time it had reached the

very edge of the adjacent ditch. Upon that development, according to Holland, the defendant turned the steering wheel sharply to the left, whereupon the car veered across the highway and leaped over the edge into the adjacent declivity. Holland's testimony indicated that as the car ran upon the shoulder, turned to the left and crossed the pavement, the defendant did not slacken its speed.

The evidence indicates that Mrs. Elliott, who, as we have indicated, had been recently hospitalized, was feeling ill during the trip. Alternately she sat upright and lay in the seat. According to Holland, Mrs. Elliott, at the time of the accident, was lying in the seat with her head on the defendant's legs.

Holland swore that no cars were in sight either in front or behind the defendant's car at the time of the accident. He declared that no conversation was in progress and that there was nothing upon the pavement to interfere with the car's safe movement. The record indicates that the car was comparatively new and had no mechanical defects.

The complaint charged negligence in the following particulars: (1) dangerous rate of speed; (2) failure to maintain proper control over the car; (3) permitting Mrs. Elliott to rest her head in the defendant's lap; and (4) failure to maintain a proper lookout.

The defendant-appellant presents fourteen assignments of error.

The first assignment of error asserts that the trial judge erred when, over the defendant's objection, he permitted a witness for the plaintiff, who was project engineer of the Detroit dam, to testify that at 3:45 p. m. of the day of the accident he drove over the place where, three-fourths of an hour later, the accident

happened and observed no rock or gravel on the pavement. "It was all clear," so the witness testified. According to his further testimony, he returned to the same place forty-five minutes later, after the accident had happened, and found this condition:

> "* * * I observed gravel on the highway. It was crushed rock from the shoulder. * * * The crushed rock was on the surface of the highway, from the right shoulder—the north shoulder, toward the center and across the center line of the road. * * * . The rock was on the road on a curve. * * * It extended from the north shoulder of the road across the center line approximately the entire width of the road for a small area."

The witness described a depression, approximately two inches deep and three feet long, on the north shoulder leading to the pavement at the point where the path of strewn crushed rock began. At the other end of the trail of strewn rock, that is, at the south edge of the pavement, he looked down the declivity and saw the defendant's battered automobile. The jury could reasonably have inferred from the testimony of this witness that the car which traveled on the north shoulder and made the three-foot depression was the one which scattered the rock upon the pavement. Such an inference would have been in harmony with Holland's testimony. The witness' testimony that three quarters of an hour before the accident the road was clear of rock, but bore the aforementioned trail of crushed rock immediately after the fatality, could warrant an inference that the rock was flung on the pavement by the defendant's automobile as it rushed from the shoulder and veered across the pavement at a rapid rate of speed.

■■ The defendant's objection, which underlies the

assignment of error now under consideration, challenges the admissibility of only the part of the above-mentioned testimony which indicated that forty-five minutes before the accident the pavement in the vicinity of the fatality was free of gravel and crushed rock. The defendant's objection was couched in these words, "too remote." Wigmore on Evidence, 3d ed, § 437, states that when remoteness is the basis of objection "the matter should be left entirely to the trial court's discretion." The section was cited approvingly in *Tracy and Baker v. City of Astoria,* 193 Or 118, 237 P2d 954. We believe that the objection of remoteness is normally subject to the discretion of the trial judge, and are aware of no reason for believing that the challenged ruling abused the court's discretion. The assignment of error is dismissed as lacking in merit.

Defendant's second and third assignments of error, which assert that the trial court committed error in denying defendant's motions for a nonsuit and a directed verdict, present the questions of the sufficiency of the evidence of negligence and of proximate cause to support the verdict which the jury returned.

The jury, according to our belief, could have found that, in attempting to return to the paved roadway from the shoulder at a speed of 50 miles per hour, the defendant operated his automobile at a negligent rate of speed, when due heed is paid to the surface, grade, width of the highway and other attendant conditions. *Prauss v. Adamski,* 195 Or 1, 244 P2d 598. We also believe that the jury could have found that, in returning to the paved highway from the shoulder, which was one inch lower, at a speed of 50 miles per hour, the defendant was responsible for conditions which rendered him unable to keep his automobile under control. We have in mind the third specification of

negligence which is based upon ORS 483.538, reading as follows:

"(1) No driver shall operate a vehicle:

\* \* \*

"(b) When he has in his lap \* \* \* another person, baggage or encumbrance which prevents the free and unhampered operation of such motor vehicle."

The word "lap" is defined in Webster's New International Dictionary, 2d Ed, as "The part of the clothing that lies on the knees, thighs, and lower part of the body when one sits down; hence, that part of the person thus covered."

■ We do not believe that we would be warranted in considering the statute as a prohibition only when the restricting or hampering object or person covers or touches all that part of the driver's person considered to be his lap. Nor does it seem reasonable to interpret the statute as violated only when the entire person of another is in the driver's lap. We think the statute is violated when there is so much of the person of another, or of a package or any other encumbrance, on a part of the lap of the driver as to prevent the free and unhampered operation of the motor vehicle. On cross-examination Holland testified:

"Q Did you see her just before the accident as to where her head was with reference to the legs of Cummings?

"A Well, I noticed her head was laying on Cummings' legs.

"Q Could you see that from the back seat?
"A Yes.

"Q In other words, she wasn't up on his lap, or anything of that kind, was she?
"A Her head was.

"Q There might have been a pillow between her head and his leg, his right leg?

"A I don't know.

"Q But she wasn't up on top of his lap?

"A Well, her head was on top of his leg.

"Q Right leg?

"A I don't know, might have been on both of them.

"Q Well, but I am asking you what you know, of course. Do you know that it was on the right leg, on top of the right leg?

"A Yes.

"Q Did you see it there?

"A Yes."

From the evidence, the jury could have found that the presence of Mrs. Elliott's head in the defendant's lap constituted a hindrance to the free and unhampered operation of the motor vehicle.

■ Next, the jury could have found from the fact that the defendant ran his car "as close to the ditch as possible without going in" [the words are those of Holland], he failed to have maintained a proper lookout. According to Blashfield, Cyclopedia of Automobile Law and Practice, § 682: "A motorist must use his eyes and see seasonably that which is open and apparent." See, also, *Morser v. Southern Pacific Co.*, 124 Or 384, 262 P 252. The fact that a motorist unnecessarily gets himself into a position of peril is evidence that he failed to maintain a lookout.

■ We, therefore, conclude that the plaintiff introduced substantial evidence in support of each of the specifications of negligence sufficient to warrant their submission to the jury. The same conclusion is warranted concerning the sufficiency of the evidence upon the issue of proximate cause.

The above observations, likewise, dispose of the second, third, sixth, seventh, eighth, ninth, eleventh, twelfth, thirteenth and fourteenth assignments of error. We will not set forth each of those assignments of error herein but all have been carefully considered, and we think that what we have said suffices to indicate that, in our belief, they lack merit.

■ Defendant's fourth assignment of error contends that the court erred when it allowed the plaintiff to amend his amended complaint, after both parties had rested, so as to incorporate in it an allegation that the children of plaintiff's intestate "were dependant upon her for care." ORS 16.390 provides:

> "The court may, * * * at any time before the cause is submitted, allow such pleading * * * to be amended, * * * when the amendment does not substantially change the cause of action or defense, by conforming the pleading * * * to the facts proved."

We believe that the amendment did not "substantially change the cause of action" but merely stated a cause that had formerly been imperfectly set forth. *Elliott v. Mosgrove,* 162 Or 507, 91 P2d 852, 93 P2d 1070. We, therefore, find no merit in the fourth assignment of error.

Defendant submits as his fifth assignment of error a contention that the trial judge failed to define fully the issues for the jury. Upon reading the instructions we found no merit in this assignment of error.

■ The question presented by the defendant's tenth assignment of error is: Did the trial judge invade the province of the jury by omitting to instruct them that they must first determine whether the children were "dependents" of the decedent before they could consider whether the children had sustained a pecuniary

loss. The defendant argues: "Instruction that assumes existence of material fact in controversy is erroneous, as invasive of province of jury."

ORS 30.020, pursuant to which the plaintiff brought his cause of action, reads:

"When the death of a person is caused by the wrongful act or omission of another, the personal representatives of the decedent, for the benefit of the surviving spouse and dependents, * * * may maintain an action against the wrongdoer, * * *."

The trial judge instructed the jury as follows:

"I instruct you that, in determining the amount of damages to which the plaintiff is entitled, if he is entitled to any damages, the measure of such damages is the actual pecuniary loss, if any, sustained by the surviving husband and children as the result of the death of Opha Clement. In considering the pecuniary loss, if any, you may consider not only the loss of financial assistance which the beneficiaries might, in the light of the evidence, reasonably have expected to receive from Opha Clement, had she lived, but also the loss of her care and attention to the physical and moral training and welfare of her children, and the husband's loss of her services in the household, if any, as shown by the evidence.

"In determining the pecuniary loss, if any, to the surviving husband and children, you may consider the age, health, and physical condition of Opha Clement, her habits with respect to industry and thrift, her capacity to earn money, her attention to the needs and welfare of her children and husband as the same may appear from the evidence."

The instruction just quoted has not been made the subject matter of challenge by an assignment of error. However, the argument in support of the assignment of error now under consideration criticizes the quoted

instruction as (1) "leapfrogging the issue of dependence"; (2) "there was no evidence of the habits of the plaintiff's intestate"; (3) "argumentative in form"; and (4) "no evidence that any of the beneficiaries ever had received any financial assistance from the decedent." It will be noticed that the instruction is not criticized as an incorrect statement of the governing rule of damages.

The evidence could readily warrant a finding that Mrs. Clement was a good wife and mother. Not only did she manage the home well and take good care of the children, but she also helped her husband provide for the family. At one time she assisted him in a cotton farming project and at another time she helped him operate an automobile trailer camp. During the years of their marriage she intermittently worked for wages as a waitress. One of those whom she served in that capacity described her as competent and strikingly neat. At the time of her death she was 33 years of age. Her marriage occurred in 1939. The evidence indicated that her health was good.

The defendant offers the following as a definition of the term "dependents" as it occurs in ORS 30.020: "Those persons who looked to decedent for support and maintenance; those persons who in fact were dependent upon decedent therefor; those persons who relied upon decedent for reasonable necessities of life." The defendant cites 12 Words and Phrases, Perm Ed, 136; *Paul v. State Industrial Accident Commission,* 127 Or 599, 272 P 267, 273 P 337; 16 Am Jur, Death, p 67, § 89; 25 CJS, Death, p 1108, § 330.

Dependence can unquestionably be based upon services which have a pecuniary value and which look toward maintenance. *Carianni v. Schwenker,* 38 NJ Super 350, 118 A2d 847.

According to 88 CJS, Trial, p 772, § 282:

"In general it is proper for the court in its instructions to assume as a fact matters or conditions presented in the case as to which there is no controversy or dispute, notwithstanding an issue as to such matters has been raised by the pleadings, * * *."

See, also, *Kilkenny, Admr., v. Beebe,* 184 Or 516, 199 P2d 916. We think that the trial court in this case could have determined as a matter of law that the four minor children, eleven, ten, eight and six years of age, had a necessitous want for that which a mother naturally and traditionally offers.

Under the instructions that were given by the trial judge in this case, the jury's finding that the children suffered a pecuniary loss as a result of their mother's death, must mean that the jury found that the mother had recognized and responded to the want just mentioned. Therefore, in this case, the jury's finding that the four minor children suffered a pecuniary loss as a result of their mother's death was in actuality a finding that the children were dependents of the decedent.

The court, therefore, did not commit reversible error in omitting to instruct the jury that they must first find that the children were dependents of the decedent before they could determine whether, and in what amount, the children had sustained a pecuniary loss.

The above is our disposition of all the assignments of error. We have found merit in none of them.

The judgment of the circuit court is affirmed.