O. L. GILLILAND, Appellant
(Defendant below),

v.

Shirley Constance RHOADS, Administratrix
of the Estate of Jesse Carlyle Rhoads,
Appellee (Plaintiff below).

No. 4476.

Supreme Court of Wyoming.

Sept. 16, 1975.

Rex O. Arney and Tom C. Toner, Redle, Yonkee & Arney, Sheridan, for appellant.

William D. Norman, and Don M. Empfield, Gillette, for appellee.

Before GUTHRIE, C. J., and McCLINTOCK and RAPER, JJ.

RAPER, Justice.

On two other occasions, this court has dealt with matters arising out of the factual background involved in this case. *Rhoads v. Gilliland*, Wyo.1973, 514 P.2d 202, concerned the disqualification of a trial judge, and *Gilliland v. Steinhoefel*, Wyo.1974, 521 P.2d 1350, concerned liability for loose livestock. Neither have any particular bearing on our disposition of the case before us.

On the night of December 28, 1970, the defendant-appellant was returning home to Gillette from his work in the vicinity of Upton. About one and one-half miles east of the Wyodak coal mine in Campbell County, some cattle had wandered onto the highway and two brand inspectors, plaintiff-appellee's decedent, Smokey Rhoads, and a Whitey Draine were notified of this predicament by a sheriff's deputy, based on a report by a passing motorist. They went to the scene and parked their vehicles on the shoulder of the east-bound lane, preparatory to removing them. It was 7:30 p. m. and for that time of year, darkness had fallen, when these and other events leading to the death of the plaintiff's husband took place.

While both brand inspectors were attempting to move the cattle from the road, the defendant, driving a Chevrolet sedan, approached the cattle from the east. Without making any visible efforts to stop, he drove his automobile into the cattle, injuring one cow and killing another. The defendant's vehicle swerved from the impact with the livestock to the left side of the road, grazed the Rhoads pickup, continued and collided with the Draine pickup head on, which, in turn, hit plaintiff's decedent, standing at its rear, throwing him approximately 40 feet into the borrow pit. Rhoads died in the emergency room of the Campbell County Memorial Hospital.

This wrongful death action followed. The case was tried once in 1972 and a ver-

dict was directed for the defendant. The matter was appealed and remanded for a new trial by this court upon the basis of disqualification of the trial judge and not on the issue of the directed verdict. The jury, upon new trial, returned a verdict of $60,000.00 for plaintiff, upon which judgment was regularly entered. It is from that judgment this appeal is taken. In order to consider defendant's alleged errors, a narrative of events taking place during the trial will be first required.

Since the occurrence and before either trial, Whitey Draine, the brand inspector with the plaintiff's decedent, died. He had made an oral statement to the investigating highway patrolman which the plaintiff's attorney attempted to introduce as an excited utterance. The statement was objected to upon the grounds that it was hearsay, irrelevant and immaterial; initially, the objection was sustained. Counsel for the plaintiff then argued that the statement was admissible under the res gestae exception to the hearsay rule and made the following offer of proof:

"This statement will be to the effect that Mr. Draine waived [sic] his light, tried to stop the Gilliland vehicle and was unable to do so and had to jump in the borrow pit. * * *"

After the offer of proof, the trial judge still sustained the objection but indicated that he would take the matter under advisement and hear further argument in chambers. He then announced he would allow the patrolman to testify as to the Draine statement as a spontaneous exclamation. The objection was renewed and the officer proceeded to testify as follows:

"He [Draine] stated that as soon as they arrived at the scene where the cattle were that they had pulled to the right, shut off their lights, and turned on thier [sic] emergency flashers. They both got

out of the car, their pickups, and were talking about whose cattle they might be, where they may have gotten out and where they could put them back into a pasture. At this point he stated that he heard a vehicle coming from the east at a high rate of speed. He told Smokey to look out. He turned back to his pickup to get a flashlight and ran towards the east up the road waving the flashlight. He then said that the vehicle didn't slow down and he thought it would hit a cow and he hollered to Smokey again to look out, and he ran into the north borrow pit as the car hit the cow."

The defendant then moved to strike the witness' answer on the ground that it was not a spontaneous utterance. The court sustained the objection and instructed the jury to disregard the testimony.[1] The defendant thereupon moved for a mistrial on the ground that the testimony was so prejudicial that the admonition not to consider the answer was insufficient to remove the prejudice. The court reserved a ruling on the motion but later denied it. At the close of the plaintiff's evidence, the defendant moved for a directed verdict on the ground that there was a failure of proof and reasserted the motion for a mistrial. It was denied by the court. At the close of all the evidence, following renewal of all of defendant's motions, their denial, instructions and closing arguments, the jury retired and after deliberation returned its verdict for plaintiff.

The defendant moved for a judgment notwithstanding the verdict and for new trial. As a basis, he asserted: misconduct of the attorney for plaintiff, error in denying defendant's motion for mistrial, surprise occurring during the course of the trial which ordinary prudence could not have guarded against, lack of substantial

---

1. The trial judge's full instruction to the jury is as follows:
   "I'll sustain the objection of counsel and I instruct the jury to disregard the last testimony given by this witness in regard to the answer of the question as to what was told to him. You're not to consider that in arriving at your decision."

evidence that the defendant was guilty of negligence as the proximate cause of the occurrence, error in denying the defendant's motion for a directed verdict and error in allowing patrolman Richie to testify in regard to the Draine statement. The motion was supported by an affidavit of the patrolman indicating that he had gone over Mr. Draine's statement with plaintiff's counsel on several different occasions.

The defendant's grounds of error here are:

1. The trial court should have granted the defendant's motion for a mistrial and for a new trial because it was error to admit the hearsay statement made at the scene of the accident by Whitey Draine to the patrolman. The plaintiff's attorney had asked the patrolman several times about the Draine statement prior to trial, yet he made an offer of proof which was not an accurate representation of what the witness would say. The court's instruction to disregard this statement, once it was admitted, was insufficient to remove the prejudice which had occurred.

2. The prejudice of allowing the jury to hear the Draine hearsay statement is manifest in that there was no substantial evidence without it to support the jury's verdict in this case. The court should have granted a judgment notwithstanding the verdict.

3. The court erred in allowing a motorist who had passed through the cattle several minutes before the plaintiff to testify that he managed to avoid the cattle. Proof that one individual managed to avoid an accident at another time is not admissible to show that the defendant failed to exercise reasonable care.

4. The court failed to properly instruct the jury on the issue of proximate cause.

We need not concern ourselves with whether or not Draine's statement to the highway patrolman was an exception to the hearsay rule because the trial court finally held it inadmissible, though it was a close question explaining the trial judge's vacillation. The issue which we have to determine is whether or not an instruction to the trial jury, after the testimony was stricken from its consideration, was an adequate correction of a previous erroneous ruling, assuming but not deciding that it was. The defendant, of course, takes the position that once made, it is impossible to wipe such testimony out of the mind of the jury and that it must have been prejudicially influenced in its verdict accordingly.

As is usual practice, the trial court in this instance at the beginning of the trial, gave a general instruction, outlining the duties of the jury and court with respect to rulings on evidence and warned the jury that a situation may arise during the course of the trial where improperly admitted evidence must be stricken and disregarded and in that opening instruction said:

"If any evidence is admitted and afterwards is ordered by me to be stricken you must disregard entirely the matter stricken, * * *."

The proposition presented with respect to the postponed ruling is not a new one. In 1833, it was said in *Hamblett v. Hamblett*, 6 N.H. 333, 346–349:

" * * * we cannot adopt the broad principle there [New York] laid down, as sound law, applicable to all cases, [that an erroneous ruling cannot be cured by subsequent revocation and instruction] * * *.

"The reason, that the testimony so given in presence of the jury, *might have* an influence, though they are directed to disregard it, would apply with equal force in all cases where any thing irrelevant may have crept in during the course of the trial, and would entitle parties to a succession of new trials, until no sentence should have been uttered which by any possibility might have an undue influence, though the jurors were unconscious of any influence.

"It is apparent that the principle cannot be carried to this extent, and other au-

thorities show it must fall far short of it, even if it can be supported in any degree.

\* \* \* \* \* \*

"Cases are of daily occurrence, also, where evidence is admitted, which, from a failure to connect it with other evidence, with which it had a necessary connexion [sic] in order to be relevant, eventually turns out to be incompetent. The utmost caution cannot always prevent the introduction of evidence, which in the course of the trial is discovered to be clearly inadmissible, and if, in such cases, its introduction was to be regarded as ground for a new trial, on the application of the party objecting, the practice should be to stop the case, and begin *de novo* to another jury, for however strongly the jury were directed to disregard the testimony, it could not be shown that it had not had an influence upon the verdict, of which the jurors were not conscious—and yet it is not believed, that a practice of stopping a trial upon such account, ever prevailed in any court.

\* \* \* \* \* \*

"This rule respecting the introduction of incompetent testimony may admit of exceptions. If the testimony be of a nature to excite popular prejudice, and if there is good reason from the verdict to suppose that it must have influenced the jury improperly, notwithstanding the direction of the judge that it was to be disregarded, such case might furnish an exception, and the granting of a new trial be a proper exercise of the discretion of the court. \* \* \*" (Emphasis theirs.)

The Supreme Court of the United States at the turn of the century had this question before it. *Turner v. American Security and Trust Co.,* 1909, 29 App.D.C. 460, aff., 213 U.S. 247, 29 S.Ct. 420, 53 L.Ed. 788, wherein in 213 U.S., at page 267, 29 S.Ct. at page 424, it was said:

"The general rule is that the admission of incompetent evidence is not reversible error if it subsequently is distinctly withdrawn from the consideration of the jury. [Citing cases.] There are cases which emphasize the necessity of clearly and unmistakably withdrawing the evidence from the consideration of the jury. [Citing cases.] But we are satisfied that this was done in this case, and that the instruction cured the error. \* \* \*"

With little discussion and without a statement of the full rule, our court in *Montgomery v. Empey,* 1926, 36 Wyo. 37, 45, 253 P. 17, 19, approved the trial court's striking of a witness' testimony and instructing the jury to disregard it. The matter of any prejudicial effect on the jury, one way or another, was not covered by the opinion.

■ Error in the admission of evidence as a ground for new trial is healed, as a general rule, if the trial court orders the evidence stricken out and instructs the jury to disregard it but where it appears that the prejudicial effect of the testimony has not been fully overcome, a new trial notwithstanding the court's instruction will be granted. 66 C.J.S. New Trial § 40b, page 137; 58 Am.Jur.2d (New Trial), § 122, page 328; *Gaskins v. Tarpley,* 3 Cir. 1972, 456 F.2d 1149; *Cross v. Houston Belt and Terminal Railway Co.,* Tex.Civ. App.1961, 351 S.W.2d 84, 96 A.L.R.2d 1; *Menarde v. Philadelphia Transportation Co.,* 1954, 376 Pa. 497, 103 A.2d 681; *Boyd v. Smith,* 1953, 372 Pa. 306, 94 A.2d 44; *Pittsburg, C., C. & St. L. Ry. Co. v. Montgomery,* 1898, 152 Ind. 1, 26, 49 N.E. 582, 591, 69 L.R.A. 875, 886, 71 Am.St.Rep. 301, 320.

We then must search the record to determine whether defendant was prejudiced. In the first place, it must be realized that jurors are men and women of the world, reasonably endowed with the same intelligence as the rest of us mortals. They are drawn at random and so therefore represent a cross-section of the general public. During the selection process, at the beginning of the trial, they are carefully

screened by the procedure of voir dire examination and the parties accept them on the basis that they are fair and impartial and will a true verdict render. We must realize that the level of education has risen and with that comes knowledgeable and understanding citizens. They participate as a part of our jurisprudence and the district court in this case has taken special pains to instruct them, at the outset of the trial, as to the functions of the court and jury and has implored them to conscientiously consider and weigh the evidence and be uninfluenced by prejudice. Their duty to follow the instructions as to the law given them by the court is emphasized. We are not dealing with uninformed persons.

In order, then, to make a determination that the jury did not have wiped from their minds any effect of the stricken testimony, we must probe the record to search for prejudice as a result somehow reflected in their verdict for the plaintiff. A good starting point is to look at what they, the jury members, really heard from Whitey Draine's statement to the patrolman, which defendant considers objectionable as making the only case plaintiff had, namely, the statement fills in the missing evidence that Rhoads and Draine made an attempt to warn oncoming traffic and speed of the defendant's approaching vehicle. We have therefore dissected out of Draine's statement on defendant's own premises, those parts of which he complains:

"~~He stated that as soon as they arrived at the scene where the cattle were that they had pulled to the right, shut off their lights and~~ turned on thier [sic] emergency flashers. ~~They both got out of the car, their pickups, and were talking about whose cattle they might be, where they may have gotten out and where they could put them back into a pasture.~~ At this point he stated that he heard a vehicle coming from the east at a high rate of speed. ~~He told Smokey to look out. He turned back to his pickup to get a flashlight~~ and ran towards the east up

the road waving the flashlight. He then said that the vehicle didn't slow down ~~and he thought it would hit a cow, and he hollered to Smokey again to look out, and he ran into the north borrow pit as the car hit the cow.~~"

Taking what is left of the statement, then remained the following with respect to warning: "* * * turned on thier [sic] emergency flashers * * * and [Draine] ran towards the east up the road waving the flashlight. * * *" The defendant made statements in the hospital to relatives of the decedent:

"He told us the first thing that he remembered was seeing lights, and his first impression was that there had been an accident, and then he said he saw this flashlight motioning, and he decided they wanted him to drive on the other side of the road. The last he remembered was when he hit the cow."

"* * * That's when he mentioned he could recall seeing lights and a circling light which he thought was directing traffic or something. His immediate thought was there was an accident and then the last thing he remember [sic] was hitting a cow."

At the trial the defendant did not deny making the statements and testified:

"Q  Can you explain that recollection in any more detail?

"A  No. It's just a flash. It seems like just a flash of colored lights, you know, and a lot of noise, and that was it."

There is corroboration of this testimony in that when the highway patrolman arrived at the scene shortly after the occurrence, the flashers on the Rhoads vehicle were operating and on top of Draine's vehicle was a reflectorized bar several inches in height and about half the width of the truck cab, facing the direction from which the defendant came. It reflects light from oncoming automobile headlights. A few minutes after the accident, a motorist with

passengers came on the accident scene and passengers said they saw the reflector device on top of the pickup, illuminated.

The Draine statement goes on to say, "At this point he stated that he heard a vehicle coming from the east at a high rate of speed. * * * He then said that the vehicle didn't slow down * * *." The record contains evidence of speed without this. By the defendant's own testimony, he was traveling at the speed limit which at that time was posted at 65 miles per hour. He saw neither the cattle nor the trucks. There is no evidence that he applied brakes so the jury could safely infer that he hit the cattle going at that speed, glanced off a pickup and hit the other head on, with the final unexpended force striking the decedent and throwing him 40 feet. The defendant's vehicle and the Draine vehicle were well telescoped into each other, as shown by photographs taken on the spot. The jury needed no other evidence of speed. The trail of devastation speaks for itself.

■ Speed in itself is not negligence, particularly when it is within posted limits, as here. We only discuss it in connection with defendant's contention that Draine's excluded statement was the only evidence of speed. We can accept defendant's statement that he was driving at 65 m. p. h. at the time of the collision. It is from other evidence that defendant failed to slow down in that no tire marks left by braking were found at the scene. Draine's statement said that the car he heard was approaching at high speed, not at an unlawful rate of speed, and did not slow down. Defendant's negligence was not in the speed but in his failure to see what could have been seen within the range of his headlights and what he should have seen.

■ The crowning evidence of negligence lies in the failure of the defendant to see what he should have seen, the evidence being that the cattle and vehicles could be seen within the range of headlights. His automobile was in excellent operating condition and his headlights completely functional. By a related rule, it is considered negligence to drive an automobile on the highway at night, at such speed that it cannot be stopped within the distance that objects can be seen ahead of it. *Merback v. Blanchard,* 1940, 56 Wyo. 152, 167, 105 P.2d 272, 276, reh. den., 56 Wyo. 286, 109 P.2d 49; *Cushing Refining & Gasoline Co. v. Deshan,* 1931, 149 Okla. 225, 300 P. 312; *Lang v. Hanlon,* 1930, 302 Pa. 173, 153 A. 143; *Haines v. Carroll,* 1928, 126 Kan. 408, 267 P. 986; *Roth v. Blomquist,* 1928, 117 Neb. 444, 220 N.W. 572, 58 A.L.R. 1473; *Knapp v. Sommerville,* 1928, 196 Wis. 54, 219 N.W. 369; *Skaug v. Knappins,* 1927, 241 Mich. 57, 216 N.W. 403; *Fisher v. O'Brien,* 1917, 99 Kan. 621, 162 P. 317, L.R.A.1917F 610; and *People v. Brown,* 1906, 3 Cal.App. 178, 84 P. 670. But defendant drove head on into the cattle, making no effort to stop, when they could have been seen, as later in this opinion discussed.

■ The foregoing is, of course, a refinement for application to night-time driving of the rule long approved in this state that a person is presumed to see that which he could see by looking. He will not be permitted to say that he did not see what he must have seen, had he looked. The duty to keep a lookout includes the duty to see that which is in plain sight. *Checker Yellow Cab Co. v. Shiflett,* Wyo.1960, 351 P.2d 660, 666; *Hawkins v. Loffland Brothers Co.,* 1952, 70 Wyo. 366, 380, 250 P.2d 498, 503; *Ries v. Cheyenne Cab and Transfer Co.,* 1938, 53 Wyo. 104, 115, 79 P.2d 468, 472; *Chapman v. Ewing,* 1933, 46 Wyo. 130, 24 P.2d 687, reh. den., 25 P. 2d 1019. A person is charged with seeing that which is there to be seen, the same as though the person looked and saw what was there to be seen. *Holstedt v. Neighbors,* Wyo.1962, 377 P.2d 181, 183; *Zanetti Bus Lines, Inc. v. Hurd,* 10 Cir. 1963, 320 F.2d 123, 127. The defendant was on a long straight and level stretch of road with no hills, curves or other obstacles to interfere with his vision. There was noth-

ing to distract or disconcert him. The highway was dry, no snow or rain was falling. There was snow alongside the highway and on the adjoining landscape which, in the common experience, would brighten visibility.

■ It was from all the circumstances thus disclosed and the jury's position of advantage, in observing the witnesses and hearing the testimony, to arrive at the ultimate decision of negligence—in other words, it was a jury question and we find the evidence more than sufficient for the jury's consideration even in the absence of the Draine statement. Draine's stricken statement was not prejudicial.

■ Nor can we see any misconduct on the part of plaintiff's counsel. His offer was substantially what he expected the highway patrolman to testify to, when stripped of the nonessentials. The defendant can hardly claim surprise because he would likewise know or be charged with knowing what the patrolman's testimony would be; discovery has taken away the possibility of surprise and any secrets in the trial of a case. Ordinary prudence could have guarded against any lack of information as to the extent of the patrolman's knowledge of what Mr. Draine had reported to him. No post mortem affidavit was necessary. The case had been tried once previously and defendant should have known all there was to know about it, fact-wise.

With respect to defendant's claim of error in allowing a motorist who had passed through the cattle several minutes before the plaintiff to testify that he managed to avoid the cattle, in that proof one individual managed to avoid an accident at an earlier time, is not admissible to show that the defendant failed to exercise reasonable care. The plaintiff claims that she was not attempting to show that there had not been other accidents at the scene but that it was offered to show that about 10 minutes previous to the accident another driver came through the area, saw the cattle at

the distance of his headlights and to demonstrate that the cattle were visible within the range of normal headlights at about the time of the accident. It was offered to substantiate the plaintiff's position that the defendant had failed to see what he should have seen.

The rule surrounding this contention appears in 29 Am.Jur.2d (Evidence) § 300, pages 345–346, where it is said:

"* * * when the condition of premises or of an appliance at a particular time is in issue, evidence of the condition of such premises * * * at a time prior or subsequent to the time in question is relevant and admissible, provided it relates directly to the issue in question and is not too remote in point of time. * * * [N]o fixed rule can be laid down other than that the evidence must relate closely enough to the time in question to make it apparent that the condition has not been changed * * *."

As observed in II Wigmore on Evidence, 1940, § 437(1), page 413, when a condition at a given time is in issue, the prior existence of it is in human experience some indication of its probable persistence or continuance at a later period and the text goes on to say:

"The degree or probability of this continuance depends on the chances of intervening circumstances having occurred to bring the existence to an end. The possibility of such circumstances will depend almost entirely on the nature of the specific thing whose existenec [sic] is in issue and the particular circumstances affecting it in the case in hand. That a soap-bubble was in existence half an hour ago affords no inference at all that it is in existence now; that Mt. Everest was in existence ten years ago is strong evidence that it exists yet; whether the fact of a tree's existence a year ago will indicate its continued existence today will vary according to the nature of the tree and the conditions of life in the region. So far, then, as the *interval of*

*time* is concerned, no fixed rule can be laid down; the nature of the thing and the circumstances of the particular case must control.

"Similar conditions affect the use of *subsequent existence* as evidence of existence at the time in issue. Here the disturbing contingency is that some circumstances operating in the interval may have been the source of the subsequent existence, and the propriety of the inference will depend on the likelihood of such intervening circumstances having occurred and been the true origin. * * *"

■■■ We have no problem of the condition changing because the motorist and passengers passed through the area only 15 minutes before the tragic occurrence. The only question would go to remoteness and that is a matter left to the discretion of the trial judge and as Wigmore says in continuing his discussion at page 417, it should be left entirely to him. See *Pure Gas and Chemical Co. v. Cook,* Wyo.1974, 526 P.2d 986, 992. *Clement v. Cummings,* 1957, 212 Or. 161, 317 P.2d 579, 582, is a case where the condition of highway was observed 45 minutes prior to an accident. We cannot see that the trial judge abused his discretion, especially since the defendant requested no instruction from the court limiting the purpose of the testimony.

The defendant fails to recognize that it is the duty of the jury to sort out from the evidence the fact that there was at least one truck with flashers going when the collision occurred and they should be credited with the sense to realize that cattle move about and, of course, they would not be standing in the same place when the defendant came along. The real point is that they could be seen within headlight beams, even without the presence of trucks, one of which had a light-colored top in addition to flashing lights. These expanded the elements which should have attracted the attention of the defendant and alerted him to the dangers, over those encountered by

the witness to whose testimony defendant objected. Justice and common sense should be applied to legal philosophy in order to destroy any obstacle tending to deprive the jury of relevant facts which can assist in arriving at a correct solution to the factual problem confronting them. It seems only sensible and logical that if evidence be available to demonstrate what could be seen on the highway at that time of the night with operational headlights, it ought to be admissible. While not favoring defendant, it was not prejudicial.

■■■ With a certain amount of—possibly commendable—courage, the trial judge departed from the traditional, established and accepted jurisprudence of this state by knocking heads with the venerable old definition of proximate cause. Ever since *Lemos v. Madden,* 1921, 28 Wyo. 1, 10, 200 P. 791, 793, judges have dutifully and by rote intoned to juries that:

"* * * The proximate cause of an injury is that cause which in natural and continuous sequence, unbroken by any efficient intervening cause, produces the injury, and without which the injury would not have occurred. * * *"

Defendant offered the *Lemos* rule in a form of instruction and it was refused by the court. Over the objection of defendant, the instruction used by the trial court was:

"A direct cause is a cause which directly brings about the injury either immediately or through happenings which follow one after another."

The traditional instruction has been the subject of controversy. Prosser, 4th Ed. H.B.1971, § 42, page 244, has some unkind remarks to make about the word "proximate" when he states, "The word 'proximate' is a legacy of Lord Chancellor Bacon, who in his time committed other sins."

In *Capaldo v. Reimer,* 1963, 40 N.J. 269, 191 A.2d 298, 300, a negligence case, the trial judge, having omitted an instruction on proximate cause, agreed to add it in his

charge to the jury but he preceded the charge with the following comment:

> " 'I have been asked to charge you further on a subject which I thought that I had covered sufficiently without specifically using the words, proximate causation, two words in the law that I detest and consider largely meaningless.' "

The appellate court did not reverse the case on that ground; it did somewhat slap the wrists of the trial judge in stating that, "A jury is not an appropriate audience to hear a trial judge disparge a principle of law when at the same time the jury is instructed to apply that principle to the case."

The instruction used in this case comes from Pattern Instructions for Kansas, cited as PIK, 1966, page 90, and appears as follows:

> "PIK 5.01 CAUSATION DEFINED
> "A. Proximate Cause
>
> "A proximate cause of an injury is a cause which in direct, unbroken sequence produces the injury. It is one without which the injury would not have occurred.
>
> "B. Direct Cause
>
> "A direct cause is a cause which directly brings about the injury either immediately or through happenings which follow one after another."[2]

For those apprehensive about departing from the traditional court-approved[3] instruction prevailing in Kansas, "A." was provided. "B." was furnished because the Kansas Committee on Pattern Instructions, as stated in its comments to the instructions, was convinced that "direct cause" is a term more readily understood by laymen, though the word "proximate" was considered peculiarly meaningful to lawyers. The comment went on to say:

> "The argument for the word 'direct' is not that it is accurate in connotation, rather that it is more nearly accurate than 'proximate.' The Committee could not think of any word that was completely satisfying but 'material' or 'substantial' would perhaps be more meaningful."

"B." has now been approved in *Muhn v. Schell,* 1966, 196 Kan. 713, 413 P.2d 997, 1002, where it was noted:

> "It is no doubt the changes in phrasing in the Pattern Instructions that has caused appellant's criticism. The Pattern Instructions recognize that instructions are for the benefit of laymen on the jury, not the bench and bar. Words and phrases are used which are most readily understood by the laymen. So long as the changed words and phrases tend to clarify the change is not objectionable."

Prosser, supra, had more to say at page 244, about the word "proximate":

> " * * * The word means nothing more than near or immediate; and when it was first taken up by the courts it had connotations of proximity in time and space which have long since disappeared. It is an unfortunate word, which places an entirely wrong emphasis upon the factor of physical or mechanical closeness. * * * "

Moving now to the application of the given instruction in the case before us.

---

2. Since the 1966 publication of Kansas Pattern Instructions, the 1975 supplement recommends that no instruction be given defining causation, and now:
   " * * * The Committee suggests that there is neither need to define cause or result nor need to use any qualifying words when instructing jurors about cause or effect. These terms are commonly used by laymen and the use of explanatory words or further definitions tends to confuse. As the Committee commented in the original draft, 'The chapters on implied warranty of fitness and intentional torts reveal instructions in which the jury is told of damages "resulting." No attempt is there made to go into causation and those instructions are in common use, albeit only as to those specific areas.' "
   We need not consider this further departure from historical precedent but at this time footnote it only as a matter of interest.

3. *Shideler v. Habiger,* 1952, 172 Kan. 718, 243 P.2d 211.

In a most interesting discussion of proximate cause and the problems incident to the use of the term and a suggestion that it ought to be reexamined in the specially concurring opinion in *Dewey v. A. F. Klaveness & Co., A/S,* 1962, 233 Or. 515, 379 P.2d 560, 572, the problem is pinpointed as far as our particular case is concerned by the following statement:

"* * * In the typical automobile collision case the causal relation ·in this sense is clear—defendant's automobile collides with plaintiff's automobile and as a result plaintiff is injured. Where the fact of collision is established the real issue is not whether defendant caused the injury but rather whether defendant should be held liable for what was admittedly [4] caused by him. As I have already stated, this is a question of evaluating defendant's conduct to determine whether he should be liable, an inquiry which should not be clouded by casting it in terms of 'proximate cause' or any other kind of cause. If the fact of cause and effect is not in dispute, the language of causation should vanish from the case. In such case an instruction on the issue only serves to confuse the jury as there is no issue on the fact of actual causation. Obviously, if there is evidence to support the contention that defendant's automobile was not involved in the accident or that it was involved but that its physical involvement was not a substantial factor in producing the injury then, of course, the question would be one for submission to the jury. * * *" (Footnote supplied.)

There is no question about the cause of the accident, as disclosed by the evidence. The defendant hit a cow, glanced off a truck, struck another truck which, in turn, threw the plaintiff's decedent some 40 feet. There is no indication that the negligence of a defendant was any less than the direct or proximate cause of the collision and the sequence of events happened one after another. There is no indication of any intervening cause so the omission of those particular words, which defendant urges were omitted from the instruction, cannot be prejudicial. An intervening cause is one that comes into being after a defendant's negligent act has occurred. *Fagan v. Summers,* Wyo.1972, 498 P.2d 1227, 1229. There being no evidence of any intervening cause, as we see it, such an expression would be meaningless and it would be improper to instruct the jury in that regard, anyway. Instructions not sustained by the evidence should not be given. *Edwards v. Harris,* Wyo.1964, 397 P.2d 87, 90, and the cases there cited.

The trial court properly associated negligence as a cause of injuries when in his general instruction outlining the issues presented for the jury's consideration, it is set out:

"The burden is upon the plaintiff to prove that the defendant was negligent in one or more of the particulars alleged and that the defendant's negligence was a direct cause of the injury to and subsequent death of Jesse Carlyle Rhoads."

Proper instructions defining negligence and ordinary care were also given.[5] We can see no lack of informing the jury of

---

4. In our case, the defendant did admit that his automobile collided with a cow and as a result plaintiff's decedent sustained injuries causing his death; he only denies negligence.

5. "Negligence is the lack of ordinary care. It is the failure of a person to do something that a reasonably careful person would do, or the act of a person in doing something that a reasonably careful person would not do, measured by all the circumstances then existing. The law does not say how a rea-

sonably careful person would act under those circumstances. That is for you to decide.
"When I use the words 'ordinary care', I mean the care a reasonably careful person would use under circumstances similar to those shown by the evidence. The law does not say how a reasonably careful person would act under those circumstances. That is for you to decide." *Hildebrand v. Chicago, Burlington and Quincy R. R.,* 1933, 44 Wyo. 488, 13 P.2d 1081, aff'd, 45 Wyo. 175, 195, 17 P.2d 651, 657.

the necessity of causal connection between defendant's negligence and plaintiff's loss.[6]

We hold that there was no error in the court's use of the Kansas instruction in this particular case.

A careful examination of the record discloses no lack of evidence, erroneous ruling or improper instructions requiring a new trial.

Affirmed.

6. Justice Blume, the author of *Lemos*, supra, wrote in *Frazier v. Pokorny*, Wyo.1960, 349 P.2d 324, 329, about cause in fact and in citing a case approved a definition of proximate cause that the occurrence must be the natural and probable consequence of the act of negligence. This denotes direct cause; we see no reason to be irretrievably glued to the term "proximate."